110    329
e140  ¹ 83

## LATHROP v. SINCLAIR.

1. ESTATES OF DECEDENTS — CLAIM FOR SERVICES — EVIDENCE — QUESTION FOR JURY.

Where, in an action against an estate for services rendered to decedent by way of attendance and companionship, there was evidence of statements made by the deceased indicating that such services were performed and received upon an understanding that they should be well paid for, and that they were requested by decedent as a matter of right, it was proper to submit to the jury the question whether claimant was entitled to recover, under instructions that the amount of a bequest accepted by claimant under decedent's will should be deducted from the amount of the verdict.

2. SAME—VALUE OF SERVICES—COMPETENCY OF WITNESSES.

A witness in such action, who, together with claimant, resided in decedent's house, and who showed herself possessed of a general knowledge of the physical condition of decedent, and of the necessity for care, and of the kind of care furnished by claimant, was properly permitted to give an estimate, based on the conditions described, as to the value of the services rendered.

Error to Kent; Adsit, J. Submitted April 8, 1896. Decided July 28, 1896.

The claim of Helen A. Lathrop against the estate of Anna Miller, deceased, was disallowed in probate court, and claimant appealed. From a judgment for claimant, Malcolm C. Sinclair and another, executors, bring error. Affirmed.

*Taggart, Wolcott & Ganson,* for appellants.

*Taggart, Knappen & Denison,* for appellee.

HOOKER, J. The claimant was an unmarried woman, who was allowed compensation from the estate for services alleged to have been rendered to testatrix by way of

companionship and attendance. The claimant maintains that the evidence shows an agreement to compensate her for such services as she should render, while the defendants assert that, at most, it is shown that testatrix promised to remember her in her will to such extent as she thought just or proper. The claimant was not a competent witness, and the evidence in support of her claim consists of statements of the testatrix, which, in our opinion, were such as to raise a question for a jury as to what was intended by testatrix and understood by the parties upon this subject. The court did not err, therefore, in refusing to direct a verdict for the defendants.

Error is assigned upon the admission of the testimony of Misses Parker and Green, who lived in the house, as to their opinions of the value of the services rendered. The objection raised was that they were not shown to have sufficient knowledge of the services rendered. While, from the nature of the services, no one could know every incident of such service, these witnesses were possessed of a general knowledge of the condition of the testatrix, and the necessities for and kind of care furnished, for a long period, and apparently they were as familiar with all the circumstances as any person other than testatrix and the claimant. They testified to what they did know, and based their estimate upon the conditions described, which afforded an opportunity to the jury of judging of the value of the services, and of the opinions given. We consider the testimony competent.

Error is also assigned upon the arguments of counsel, but we discover nothing therein that calls for a reversal of the case. We have repeatedly said that the injury must be apparent, or the abuse very great, before we would interfere with the exercise of the discretion of the circuit judge in relation to the language of counsel.

Other questions are raised, a discussion of which would be profitless. If there is any error in the case, we think it is confined to the conclusions of the jury upon disputed questions of fact, with which we have nothing to do.

The order of the circuit court is affirmed.

MONTGOMERY and MOORE, JJ.; concurred with HOOKER, J. LONG, C. J., did not sit.

GRANT, J. (*dissenting*).   1.   *General Statement.*

The claimant, Miss Helen Lathrop, presented a claim to the probate court of the county of Kent against the estate of Mrs. Anna Miller, deceased, couched in the following language:

"THE ESTATE OF ANNA MILLER, DECEASED, DR.
       "To Helen Antoinette Lathrop:
"To the value of the personal care, attendance, and companionship of claimant, rendered to deceased from the year 1885 to the death of said Anna Miller, viz., October 29, 1893, at the request of said Anna Miller, $5,000."

The claim was disallowed by the probate court, and on appeal to the circuit court the jury rendered a verdict for the claimant of $2,500.

Mrs. Miller and her husband owned a large building in the city of Grand Rapids, the lower part of which was rented for stores, and in the upper part Mr. and Mrs. Miller kept a boarding house.   Mr. Miller died in 1885. For about six years previous to his death the claimant boarded and roomed with Mrs. Miller.   Mrs. Miller kept a boarding house for a short time after her husband's death, during which time claimant boarded with her. She then discontinued the boarding house, but took roomers; claimant being one of them, and continuing to pay rent to Mrs. Miller during the period covered by her alleged services.   Her bedroom was next to the bedroom occupied by Mrs. Miller.   There was a door between them, which was usually kept locked, and the dresser of claimant stood against it.   During the entire period, both before and after Mr. Miller's death, claimant was employed as a school-teacher in the city of Grand Rapids, receiving a compensation of from $675 to $725 per year. Miss Lathrop and Mrs. Miller were ladies of refinement

and education, and were on terms of close intimacy and friendship during the 14 years in which Miss Lathrop roomed in the house. Mrs. Miller had a parlor to which Miss Lathrop and the other boarders had free access.

Mrs. Miller was not in the best of health after her husband's death, though she attended to her own business affairs, social duties, and frequently went out driving, herself driving the horse. She was ill two or three times during these eight years, and confined to her bed. During these times a nurse was employed to take care of her. The claim of Miss Lathrop is that she had a contract with Mrs. Miller by which she was to receive compensation for what she did for her, and for companionship to her. Miss Lathrop took no time from her school duties to perform these services. Her relation in the household, to all appearances, was the same after Mr. Miller's death as before. Mrs. Miller was subject to fainting spells, during which she lost consciousness. It is in evidence that on these occasions Miss Lathrop often assisted her,—sometimes got up in the night at the call of Mrs. Miller, and either assisted her herself, or called the nurse to do so; that she played cards and backgammon with her to a greater extent than did the other boarders. At one time, —but how long after Mr. Miller died does not appear,— Mrs. Miller proposed to raise the rent of Miss Lathrop's room. Miss Lathrop declined to pay more, and informed her that she should change her residence if the rent was raised. The matter was arranged by Miss Lathrop's paying the same rent as before. On two summer vacations, Mrs. Miller and Miss Lathrop went on excursions together,—one on the St. Lawrence, to Halifax, and the other time to Waukesha, Wis., and around the Lakes. Each paid her own fare. Miss Lathrop went away most of her other vacations, spending them with her relatives and friends as she chose. She kept no account of her services, nor is there any evidence whatever to show just when any agreement, if there was any, was made.

March 8, 1890, Mrs. Miller made a will, by which she

made certain specific bequests to her brother and other relatives and friends, and to Miss Lathrop $600 and certain of her personal property, and made Dr. Malcolm C. Sinclair her residuary legatee. To this will she made two codicils, the latter of which was executed January 19, 1892, by which she bequeathed to Miss Lathrop $400 more. June 6, 1892, she made another will, revoking the first one, by which she bequeathed to Miss Lathrop $1,000, and certain personal property of the value of about $100. To this will she made two codicils, in the last of which, executed October 19, 1893, she bequeathed certain other personal property to Miss Lathrop. Dr. Sinclair was also made the residuary legatee by this will.

Her position is best illustrated by the testimony of Mrs. Holden, a witness for claimant, that:—

"Miss Lathrop was one of the family. * * * She was there as constantly as any daughter would be in the family, and seemed to occupy the position of a daughter. * * * I mean by that, that that was her home; she usually was there as constantly as other people are at their homes."

The following special questions were submitted to the jury, and the following answers given:

"(1) Was there an understanding between the claimant, Helen A. Lathrop, and the testatrix, Anna Miller, that services were to be rendered by Miss Lathrop to Mrs. Miller, and that such services should be compensated for by a bequest in the will of Mrs. Miller?

"*Ans.* Yes; but was not sufficiently compensated therefor therein.

"(2) Were the services which were rendered by Miss Lathrop, the claimant in this case, to Mrs. Miller, rendered in the expectation that she would be recompensed therefor by a legacy or bequest to be provided for in the will of Mrs. Miller?

"*Ans.* Yes; but she was not fully."

The amount of the verdict was in fact $3,600. Miss Lathrop had taken the bequest, and the court instructed

the jury to deduct this from the amount they should find her services to be worth.

2. It is urgently insisted on behalf of the claimant that her testimony has established the fact of services and companionship rendered, from which the law implies a contract to pay what they were worth. It is sought to bring this case within the well-known rule that, where one works for another as a laborer upon his farm or in his shop, or in his store or bank, as a clerk, or in his house, as a servant, a contract of service is implied. The claimant has made no such case as will bring her within this rule. She was constantly engaged in other employment. She roomed with her friend, Mrs. Miller. Her daily routine of work naturally excluded her regular employment in another capacity. She lost no time from that service. It is in evidence, from her own witnesses, that her school duties occupied some of her time outside of the hours in the schoolroom, and that she was obliged to spend some of her evenings at her boarding house in school work. She daily returned from the schoolroom to Mrs. Miller's between 5 and 6 o'clock p. m. She performed no household work for Mrs. Miller, nor any menial service, excepting an occasional footbath and rubbing, and assistance when Mrs. Miller had her fainting spells. There is no evidence that she spent her Saturdays and Sundays in any different manner from any of the other teachers. The principal service, if it may be called such, was her companionship with Mrs. Miller in her parlor in the evening, when she sometimes read to her, and frequently played backgammon with her. To sum up their relationship in a sentence, it was none other than that of two friends, one of whom boarded and roomed with the other, and the services are none other than might naturally be expected between two close friends. The principal service was that of companionship, and it would be absurd to hold that a contract for companionship was to be implied, under these circum-

stances, to run for eight years, or during life, with the understanding that it should be left to a jury, not only to find a contract, but to guess what such services were worth. There were none of the open indications of employment necessary to establish the relation of employer and employé. There was nothing, therefore, in the relations of these parties, to justify the presumption of contract relations.

3. It remains to consider whether there was evidence to justify the finding by the jury that there was an express contract between these parties. These cases are always important, and the present case forms no exception. Mrs. Miller had little personal property, which she disposed of by her will to various friends and relatives. The building comprised the whole of her estate, which was valued at $28,000. It was mortgaged for the sum of $10,000. After providing for her debts, funeral expenses, and a monument to herself and her husband, she made money bequests amounting to $4,800. The debts proven against the estate were $4,685. If this claim is sustained, there will probably be little or nothing left for Dr. Sinclair, the residuary legatee, to whom she was indebted for medical attendance and services. It is therefore important to give quite fully the evidence upon which the learned counsel for the claimant rely to sustain the express contract, without which there could be no recovery. The provisions of both the wills of Mrs. Miller are wholly inconsistent with the theory that she understood that such a contract existed. The conduct of the parties rebuts any such presumption. Miss Lathrop kept no account of her services. There is no evidence that she ever uttered a word to Mrs. Miller to show that there was such a contract, or that she was rendering services for which she expected payment, although others, who were witnesses, were evidently friends of both Miss Lathrop and Mrs. Miller, and were daily in their company at the house. The sole foundation for this claim rests in parol, and consists of statements which it is claimed Mrs. Miller made

in conversation with some of the witnesses. Not one of the witnesses gives the exact language. Miss Parker, a school teacher, and intimate friend of the claimant, boarded with Mrs. Miller while she kept boarders, and roomed with her afterwards, and her testimony is as strong as any. On her direct examination, after testifying to what she saw Miss Lathrop do, she was asked:

" Did Mrs. Miller make any statement to you in regard to her illness, or the desire of that arrangement [referring to her playing backgammon, etc.] ? "

To this Miss Parker replied:

"I do not remember of hearing that particular matter discussed. Miss Lathrop occupied the room next to Mrs. Miller, and was therefore in call when needed for care or anything. * * * Mrs. Miller never discussed the matter of money, pertaining to Miss Lathrop, with me, except in a general way,—that Miss Lathrop was to be well paid for all she did for her. It was usually expressed in some such way as that. Such expressions as that I have heard from Mrs. Miller on a good many occasions. On one occasion, I remember, Miss Lathrop had been called up in the night. She had been called up several times several nights previous to this, when Miss Lathrop was not feeling very well. Miss Lathrop was teaching, and was obliged to get up in the morning, and go to school, after having been called up repeatedly; and on this occasion I felt that it was almost selfish of myself not to take,—bear,—more of that kind of burden; and I offered,—suggested,—to Mrs. Miller that she could call me, in case she needed care, that night, and said that Miss Lathrop was pretty tired; that she had been up the night before; 'and now,' I said, ' Mrs. Miller, if you need care, call on me tonight, instead.', Mrs. Miller's answer was something like this: No, she wanted Miss Lathrop; that Miss Lathrop could do better than anyone else for her; that Miss Lathrop understood what she wanted better than anyone else, and, when she wanted some one, she wanted her; and followed this with the remark that Miss Lathrop was doing a good deal for her, but that Miss Lathrop would be well paid for whatever she did, — would be well paid for her services. There was one other instance that I remember of some-

thing of that kind being said. It was one afternoon I came in from school, and the matter came up of who was doing for Mrs. Miller,—rendering her services. She was speaking of those who had been kind to her, and who were doing a good deal for her, and she said then that she was requiring a good deal of Miss Lathrop, but then that Miss Lathrop understood that she was to be repaid for what she did; that there was an understanding; that she and Miss Lathrop understood one another in the matter; and that she was to be repaid for whatever she did. I do not recollect that she ever made any definite statement as to just what the recompense was to be,— just exactly what form; that is, the amount. I have heard her say: 'When I am done with what I have, those who have done for me shall be well rewarded for what they have done; when I am done with what I have.' I have heard her express it in those words. I was present at the conversation between Mrs. Miller and Mrs. Ferguson regarding Miss Lathrop. I have heard Mrs. Ferguson broach the matter to Mrs. Miller, and have heard those two persons discuss the matter of Miss Lathrop's services to her, and the probability of her receiving proper recompense for the services she was giving her. As nearly as I can recollect, I have heard Mrs. Ferguson express herself to the effect that people did not generally get their pay when they waited until after the person was done with it; that it had been her experience that people did not generally receive a recompense when they waited, but she thought the proper way to recompense was to give it during the person's lifetime. They were then discussing this compensation for Miss Lathrop. * * * I cannot, perhaps, recall Mrs. Miller's exact words, but it was: 'I intend to recompense those who do service to me. I am not accepting service,—gratutious service. I am accepting those services with the determination to pay for all such services. They are not gratuitous services.' I do not think she mentioned at that time anything about Miss Lathrop understanding that she was to have compensation."

On cross-examination she at first testified that the conversation with Mrs. Ferguson was about a year or two before Mrs. Miller's death, but afterwards said she thought it was four or five years; and, when asked to

state the substance of what was said, she replied, "Mrs. Miller responded [to Mrs. Ferguson] in the spirit of acquiescing, considerably." Being interrupted, and told that she was asked for the language, she replied:

"Mrs. Miller replied, in substance, that she was receiving a great deal at Miss Lathrop's hands, and she realized it, but she was not receiving without the intention of repaying; that it was not gratuitous service; that she would be amply and fully repaid. She spoke, in a general way, that all those—that she was not accepting favors of people without intending to remunerate such persons.   *   *   *   From what she said, I took her mind to be that payment was to be made after she was through with her property. That was the meaning that I gained from what she said. She did not mention her will, but she said, in substance, 'When I am through with what I have, I intend that it shall be put where it shall repay those who have done favors for me.'"

Miss Ferguson testified to the conversation referred to by Miss Parker between Mrs. Miller and her mother. She stated that her mother said to Mrs. Miller that Miss Lathrop was doing a great deal for her, and that she thought Mrs. Miller did not appreciate it, and that—

"Mrs. Miller replied, in substance, that she did, and that, what Miss Lathrop did, she was to remember her for it, and that she was not accepting it and not intending to do something for Miss Lathrop for the work."

On cross-examination she stated it as follows:

"Mrs. Miller replied, in substance, that she was not intending—that she intended to remember Miss Lathrop for it; that she was not taking it as a gift."

Miss Green, a school-teacher, who roomed with Mrs. Miller during all the time covered by these services, testified:

"Mrs. Miller has stated to me that she felt she had a right to expect attention and services from Miss Lathrop, because she expected to compensate her for them."

On cross-examination she gave the following testimony:

" *Q.* Didn't Mrs. Miller say anything about leaving her anything in her will?

" *A.* Yes, sir.

" *Q.* What did she say about the manner and form of compensation?

" *A.* She said, ' I have provided for Miss Lathrop.'

" *Q.* ' I have provided for Miss Lathrop?'

" *A.* ' I have provided for her.' These are not her words, of course, but that was the meaning of it?

" *Q.* Provided for her in her will?

" *A.* Yes, sir."

A Mrs. Holden testified that she knew that Miss Lathrop was one of the family after Mr. Miller's death, and that Mrs. Miller frequently spoke "of Miss Lathrop as giving her attention and care." She then gave the following testimony:

" *Q.* I will ask you if she has at any time told you what her relations were with Miss Lathrop, and what she had in mind regarding them.

" *A.* I was there at one time when Miss Lathrop was away, and we had considerable conversation in regard to the state of her health, and the care that she had, and how much she missed Miss Lathrop when she was gone. She said that Miss Lathrop was always very kind to her in all of her sicknesses, and had done a great deal for her; that when she was away she missed her. And I remarked that I thought it was very—she was very fortunate in having so good a friend to be with her; and why it impressed itself upon my mind at that time was the reply she made. It was something a little unexpected, and hence it impressed itself upon my mind. Her reply was that she did not consider it an act of goodness on the part of Miss Lathrop, for, when people were paid for what they did, it could not be called goodness; and she said that Miss Lathrop would be fully paid for what she did for her. That was the extent of the conversation in that respect."

One Smith G. Ketcham testified that he had a conversation with Mrs. Miller in the winter of 1891–92, in which she said, in substance,—

"She expected Miss Lathrop would be recompensed for all the kindnesses that she had shown her; and before she got through she said that, when she was through with her property, she expected to divide it between Miss Lathrop and Dr. Sinclair."

Mrs. Pearsall, after testifying that the relations between Miss Lathrop and Mrs. Miller were apparently those of mother and daughter, testified that she heard Mrs. Miller say, in 1890, that—

"She was to provide for Miss Lathrop; that she was going to divide her property between Miss Lathrop and Dr. Sinclair,—equally divide it. She did not state that she had made her will, but that she would make it so, or was going to make it that way."

This same witness also testified to another conversation, in February, 1892, in which Mrs. Miller referred to the former conversation, and stated that she had then the same mind as before.

"I do not know as it was exactly in these words, but it is the meaning of it."

Another witness (Mary Marshal) testified that Mrs. Miller once said to her:

"'I expect to pay Miss Lathrop well for what she is doing for me, when I die;' that she once said she would remember Dr. Sinclair and Miss Lathrop alike."

This testimony falls far short of establishing a contract on the part of Miss Lathrop to render services, and on the part of Mrs. Miller to pay for them. As characterized by claimant's own witnesses, they were favors and kindnesses performed by one friend for another voluntarily, but undoubtedly with the hope and expectation that the other would remember her by a substantial bequest in her will, and which were recognized and appreciated by Mrs. Miller, and for which she expected to and did make provision. Mrs. Miller had no children, and she recognized her moral obligation to compensate those who had shown her kindnesses. Dr. Sinclair and Miss

Lathrop had shown her more kindnesses than others. Miss Parker had also rendered favors similar to those rendered by Miss Lathrop, and she was remembered by a bequest of $100. She might with equal propriety claim a contract, and that she was not fully compensated. The witnesses give the inferences which they drew from the conversations, rather than the conversations themselves. Some of the conversations occurred after Mrs. Miller had made her will of 1890. Death has sealed her mouth, and prevented her from appearing in court to answer these vague and indefinite statements; but the acts of these parties, and her wills and codicils, are a complete refutation of the inference which is now sought to be drawn from them. These conclusively show that this honest and honorable woman understood the relation which existed between them, and what she meant by her statements to these witnesses. She had no thought of any contract relation, nor is there a sentence or act on the part of Miss Lathrop that she so understood it. Mrs. Miller was kind to her, and made her gifts, customary between members of the same family. Miss Lathrop, shortly after her death, said that her home was broken up. Upon these casual conversations, resting entirely in the memory of witnesses who had no interest in remembering them, Miss Lathrop presented a claim amounting to nearly one-half the actual value of the estate, after payment of debts, legacies, and expenses. But, if we give them the most liberal construction possible, they amount to no more than this, viz., the rendition of favors, kindnesses, and companionship in the expectation of a pecuniary reward by the will of Mrs. Miller, and that, as to the amount of such reward, she relied entirely upon the discretion, fairness, and judgment of Mrs. Miller. Is it not absurd to hold, under this testimony, that these parties understood that Miss Lathrop might appeal to a court and jury, in case she thought that the bequest which she expected was not sufficient, or as much

as she thought it ought to have been? The answer to the second special question states all that can be claimed for this testimony, viz., that Miss Lathrop expected that she would be recompensed by a provision in her will. But this does not make a contract. The law does not permit the estates of deceased persons to be disposed of upon such vague statements, or upon expectations of reward. If there was any expectation of reward by will,—and no other can be claimed,—the record shows that the reward was substantial and liberal. The court should have directed a verdict for the estate.

If, however, it can be held that there was any testimony authorizing the submission of the case to the jury upon the theory of the contract, I think errors were committed upon the trial for which it should be reversed. In these cases where an attempt is made to sustain a claim against the estate of a deceased person, whose mouth is closed, and the claim rests in the uncertain memory of witnesses, scarcely one of whom claims to remember the exact language, but who gives rather his own inference as to the meaning, strict rules governing the admission of testimony and the arguments of counsel should be applied.

(1) Miss Parker and Miss Green were permitted to give their opinions as to the value of Miss Lathrop's services. They saw but little of them. They had not shown themselves to be qualified to give an opinion. The jury were fully as competent to form a judgment as were the witnesses. The testimony should have been excluded.

(2) Mrs. Pearsall was permitted to testify to statements which she claims were made to her by the deceased, as to how she intended to divide her property at her death, and as to what the deceased regarded the value of her property. These were permitted to go to the jury, under the charge of the court, as competent evidence of the value of the services. This

was clearly incompetent, and the testimony should have been excluded.

(3) Complaint is made that the learned counsel for the claimant, in his argument to the jury, traveled outside the record, and made statements and arguments not justified by it. In view of the result reached, we do not deem it necessary to set forth and discuss these statements complained of. We have repeatedly held that counsel, in their arguments, must be limited to the testimony in the case, and that it is the duty of the trial judge to see that counsel are kept within the legitimate bounds of argument.

I think it evident that the claimant cannot make any different case on a new trial, and that, therefore, none should be granted. The estate should recover the costs of both courts.