*In re* TOLSMA'S ESTATE.

TOLSMA *v.* TOLSMA'S ESTATE.

1. EVIDENCE—WITNESSES—VALUE—OPINION EVIDENCE.

In proving a claim against the estate of a decedent for services rendered by claimant as housekeeper, the opinion of a neighbor as to the value of claimant's services, with which she was acquainted, knowing about what they were worth, was properly received in evidence by the court.

2. SAME—RECEIPTS—IDENTIFICATION—WITNESSES.

Testimony of claimant showing that she and her brother found certain receipts that she had given to decedent, together with other papers, concealed in a can under the floor, was competent, not being equally within the knowledge of deceased, and the receipts were properly admitted in evidence, claimant not attempting to testify to their contents.

3. SAME—ESTATES OF DECEDENTS—PAYMENT.

*Held*, that the evidence which tended to show that claimant was working for compensation and claimed she had not been paid, supported a verdict for her, although there was disputed testimony tending to show that she had admitted being paid in full.

Error to Kalamazoo; Knappen, J. Submitted June 22, 1914. (Docket No. 109.) Decided December 18, 1914.

Mina Tolsma presented a claim against the estate of Henry Tolsma, deceased, for services performed. From a finding of the commissioners on claims allowing the claim in part, claimant appealed to the circuit court. Verdict for claimant. Defendant brings error. Affirmed.

*Claude S. Carney* and *Gordon Stewart,* for appellant.

*Jackson & Fitzgerald,* for appellee.

MOORE, J. Henry Tolsma, deceased, was a bachelor and a farmer. His sister Mina Tolsma presented a claim against his estate. Her claim is that for 18 years, 6 months, and 18 days she kept his house, doing all the housework, making butter, raising chickens, making garden, attended to the personal wants of her brother, washed and mended his clothes, cooked his meals and meals for his hired help, and upon occasions worked out of doors picked up grubs on a new clearing, driving a horse in haying, and doing various other sorts of work for which it was agreed, to state it in the language of the claim filed by her—

"By said Henry Tolsma, deceased, and the undersigned, that the services performed as aforesaid by the undersigned, Mina Tolsma, were to be compensated and paid for by him the said Henry Tolsma, deceased, and that as such compensation the said Mina Tolsma was to have and receive the land constituting the farm and home of said deceased in payment of the services rendered as aforesaid."

The commissioners allowed the claim at $1,650. The claimant appealed to the circuit court, and, from a verdict and judgment of $6,770 in her favor, the case is brought here by writ of error.

We quote from the appellant's brief:

"We will divide our brief into the following heads:

"*First.* Errors in the ruling of the court, made before submitting the case to the jury.

"*Second.* Error in overruling defendant's motion to direct a verdict.

"*Third.* Error in refusing defendant's request to charge.

"*Fourth.* Errors in the charge."

1. Under this head counsel claims it was error to allow Mrs. Kakabaker to testify as to the value of the services rendered, because it was not shown she was competent. This witness testified that she had known claimant many years, and lived during the summer seasons on a farm adjoining Henry Tolsma's farm; that she knew much about the work that claimant did; that she was acquainted with work of the character done by claimant, and thought she knew its value. We think the testimony was competent. See *Ritter* v. *Daniels,* 47 Mich. 617 (11 N. W. 409); *Lathrop* v. *Sinclair,* 110 Mich. 329 (68 N. W. 248); *Fowler* v. *Fowler,* 111 Mich. 676 (70 N. W. 336); *Miller* v. *Township of Meade,* 128 Mich. 98 (87 N. W. 131).

The claimant produced four receipts bearing her signature, the aggregate total of which was $230, and testified that she and one of her brothers found them in a tin can under the kitchen floor after Henry died, in the space about three feet high, between the earth and the kitchen floor, which space was reached by a trapdoor, and that certain other papers were found in another tin can, which, upon cross-examination, it developed were bank certificates of deposit, belonging to the dead brother, which certificates were turned over to the administrator. Miss Tolsma testified that the receipts bore her signature, and that they were made at the time the receipts bear date. It is claimed this testimony was incompetent because equally within the knowledge of the deceased, counsel citing the statute and *Schratz* v. *Schratz,* 35 Mich. 485.

It is clear that the testimony of finding the receipts

was not incompetent because that occurred after the death of Henry. In the case of *Schratz* v. *Schratz, supra,* the claimant was allowed to testify to the contents of letters which had passed between claimant and deceased. The court, in holding this testimony inadmissible, said:

"There could be no question, admitting the testimony to be true, but that the contents of the letters were within the knowledge of the deceased, equally as within that of the witness. The letters, if they could have been produced, would have been admissible, but their loss or destruction would not change the rule and permit the witness to testify as to their contents."

In the instant case the witness did not testify to the contents of the receipts, but they were put in evidence. What we have cited from the case justifies this course.

The other assignments of error may be considered together, because, if there was any question to go to the jury at all, it was submitted in a very long charge, in which the theory of defendant was stated to the jury, and the rights of the defendant as to the applicable law were carefully guarded.

The substance of the claim of appellant is stated by its counsel as follows:

"The court erred in overruling defendant's motion for a directed verdict. The court should have directed a verdict in this case at the close of defendant's testimony, because the plaintiff did not show that there was any contract relations existing between the plaintiff and deceased, and did not prove a case to be submitted to the jury.   *   *   *   There is absolutely no testimony to show that plaintiff was to receive anything for her work, or that the deceased ever agreed to pay her anything, or that he ever recognized that he was indebted to her. We maintain that plaintiff has not made as strong a case as in the case of *Robinson* v. *McAfee,* 59 Mich. 375 (26 N. W. 643)."

Counsel also cite *Rodgers* v. *Lamb's Estate,* 137 Mich. 241 (100 N. W. 440). A reference to the first-

named case shows, as will appear later, that it is not controlling. In the last-named case Justice MONT-GOMERY, speaking for the court, made use of this significant language:

"Passing by the discrepancy between these statements, there may be enough in the latter to indicate an admission on the part of decedent of an obligation to pay. But if we assume that there was a scintilla of evidence to carry the case to the jury, we see no escape from holding that the claim is barred by the statute of limitations. There was no evidence of a mutual, open account. *In re Hiscock's Estate,* 79 Mich. 537 (44 N. W. 947)."

On the trial it was stipulated that the value of the real estate was $7,000. In the instant case it is not questioned that claimant did the work for which she put in a claim, but it was urged as a defense on the part of the estate that claimant admitted she had been paid. We quote from the testimony of a contesting brother, Alfred Tolsma:

"Mina Tolsma is my sister. I had some talk with her after Henry's death. I had something to do with closing up the estate in the first instance. It was during the time of the petitioning the court for the appointment of an administrator. I asked her if she was going to put in a claim, and she said, 'No;' that she had had her pay; that Henry had paid her; that she had receipts from him—she had given him receipts. She did not say how many. She said she had an arrangement with Henry that Henry had paid her $50 a year up to the last two or three years, and then he commenced giving her $80, and she had the butter and eggs and what she would sell. This talk was back of the house on Henry Tolsma's place."

Miss Tolsma denied this conversation or any like conversation.

The character of the work done by Miss Tolsma was testified to by Edward Tolsma, a brother of Henry, who all the time lived within a mile and a half of the claimant. We quote part of his testimony:

"Mina did everything about the house and helped him on the farm at different times at different things. Henry had two houses during the time Mina lived there. He built a house when she was there; the first house he had when Mina first came. It was just a little log house. It had three rooms, I think. She did the housework in connection with that home in that house. She did everything in the line of housework, and I know she did all the housework. I always thought it was well done. He built another house a little better than the one he had, with more room, with four rooms on the lower floor and three above. I recollect that Mina, after going there the first time, went away from there and worked a little while. She went to Kalamazoo. I don't know how long she was in Kalamazoo. She went back to his place and took up the same kind of employment doing housework.

"Q. Tell the jury what you saw her doing other than the housework?

"A. I have seen her help him in the potatoes on the farm and help put up wheat, and I think a year ago last summer she helped him draw wheat in the barn, and I have seen her helping him get corn-stalks out of the field, and I have seen her pick up grubs with him and burning them, when he was clearing up the ground. * * * She always helped every year in haying, driving the horse on the horse fork. She always did that when I was there. I had conversation with Henry about Mina at different times. I don't remember any particular date. I put in corn there three years ago last spring and had a conversation with Henry about Mina at that time. We were in the yard out under a shade tree.

"Q. What did he say?

"A. He said, 'She was thinking of going away from there and going to Kalamazoo and about getting a lot and building a house on it and leaving the place.' He said he didn't know what he would do without her, and if she went away he would sell his farm, because he wouldn't try to keep the farm and have anybody work it on shares."

We quote part of the testimony of another witness:

"I worked for Tolsma two or three weeks before

he died. I had a little conversation with him once about his sister Mina working there for him.

"Q. Will you tell the jury where it was, when it was, and what was said?

"A. Well, gentlemen, I will tell you. I was passing there. I had to go to town, and I saw Mr. Tolsma out in the yard, and I went over there to see him. I knew he had been sick, and I asked him how he was getting along; and he says, 'I feel a little better today than I have felt; I think in a few days I will be able to work;' he says, 'within a day or two.' I says, 'Don't hurry yourself, and you will be around all right.' He sat down on the barn ridge, and we talked, and he got to telling me the conversation how he started there. He told me he had 30 acres down below there, south of there, that he and his brother bought together. Well, after a few years he bought his brother out, he said; then he bought some other land, and after a while I think his parents died—his mother died; some of them—and this little girl—he called her a little girl. Those are the words he said. He says, 'She came to live with me.' He said, 'I bought this, and I cleared all this up myself, only what little my brother helped me.' That his brother had cleared up part of the 30 acres, and, having bought the 30 acres, he did the rest of the work himself. Well, he says, I think, it was just a few months prior to that Mr. Kakabaker (that was his neighbor) had offered him $120 per acre for that 20 acres, and Kakabaker wanted it on his farm. I says, 'That is a pretty good price.' I says, 'Hadn't you better take that and sell the whole thing?' He says: 'No, I don't know anything else but farming. That is all I know. If I get the money it might get away from me.' And he says, 'More than that, when I am through with this, it all goes to my sister.' He says, 'It all goes to her.' What he meant by that I couldn't say, but those were the very words he spoke to me. I don't know any more than that.

"Q. Did he mention her name?

"A. No, sir; he said the little girl.

"Q. Did he state to you why it was going to her?

"A. No, sir; he didn't, because it was all going to her.

"Q. Did he say anything about what she had done for him?

"*A*. He said she had helped him make it all; she had helped him make it.

"*Q*. Did he say that was why it was going to her?

"*A*. Yes, sir.

"*Q*. How long was that before he died?

"*A*. Well, I think about 2 weeks or 2½, because I go to town once a week. It was about 2 weeks, as near as I can tell.

"*Q*. Did he mention Mina's name in connection with the little girl?

"*A*. Yes, sir; her name was Mina. Yes, sir; he said his sister Mina."

Cross-examination of Mr. Harris by Mr. Carney:

" * * * He just mentioned—he said his father —parents died. Anyhow this little girl—he called her little—she came to live with him. He says, 'I will tell you, Harris, when I am through with this, it will go to the girl.' That is just what he said. Why he said it I don't know, but that he said: 'When I am through with this it will go to her. She has been an awful help to me. She has helped to make it.'

"*Q*. Was that the substance of the conversation?

"*A*. That was the substance. That is just what the man said. What he meant by it I don't know. I didn't ask him about it. I knew nothing about his business at all. These very words Henry Tolsma said to me. 'If she outlives me it will all go to her.' "

We quote some of the testimony of another witness who lived about a half mile from Henry Tolsma:

"I recollect of Henry locating on the farm there where he afterward died. I also recollect of Mina Tolsma's coming there. I had an opportunity to observe the nature of Mina Tolsma's employment during the time she was there. I have seen her loading hay, husking corn, loading wheat, pitching cornstalks, and helping him draw, and she always kept the yard mowed. She did the housework, the washing, and ironing. I have seen her assisting in gathering in the hay and corn. I have seen her load hay and gather it. I was well acquainted with Henry Tolsma and knew him practically all my life.

183 Mich.—21.

"*Q.* Did you ever have any conversation with him about Mina?

"*A.* I have.

"*Q.* When?

"*A.* If I recollect I had the first conversation with him on the subject two years ago this winter.

"*Q.* Will you go ahead and tell the jury where you were and the substance of what was said by Henry?

"*A.* We were in the woods cutting wood at the time, and we got to talking about the girl, and I says to Henry, 'You ought to fix this thing so your sister will know what she is going to have;' and he says, 'We understand each other.' Those are the words he told me.

"*Q.* Did he say anything about what she had done for him?

"*A.* He said she had done as much for him as any wife or anybody could have.

"*Q.* Do you recollect of him buying the last piece of land about having any conversation with him about Mina at that time?

"*A.* Yes, sir.

"*Q.* What was that?

"*A.* He said he would not have bought it if it had not been for Mina.

"*Q.* How long ago was that?

"*A.* Now, I couldn't just state when he bought that.

\*     \*     \*

"*Q.* State what you said and what he said.

"*A.* He bought it for her when he was through with it.

"*Mr. Carney:* I object to that. He didn't say that; that is what you took it for; that is not what he said?

"*A.* He said he expected she would have it when he was through with it.

"*Mr. Fitzgerald: Q.* Let me ask you if you remember of Mina going away from Henry's home and coming to Kalamazoo and working during the time she was there? Do you remember of her coming to Kalamazoo and working?

"*A.* Yes, sir.

"*Q.* Do you remember of her coming back?

"*A.* Yes, sir.

"*Q.* Did you have any conversation with Henry about her at the time or about the time she came back?

"*A.* I didn't have any at the time, but I had it later on.  He told me when cutting wood.

"*Q.* What was that?

"*A.* He said he didn't know what he would have done if he hadn't got her back."

It is not necessary to quote other testimony.  We think what we have quoted shows that there was a question for the jury, under the following cases: *O'Connor* v. *Beckwith,* 41 Mich. 657 (3 N. W. 166); *In re Williams' Estate,* 106 Mich., at page 503 (64 N. W. 490); *Lathrop* v. *Sinclair,* 110 Mich. 329 (68 N. W. 248); *In re McNamara's Estate,* 148 Mich. 346 (111 N. W. 1066); *Hialey* v. *Hialey's Estate,* 157 Mich. 45 (121 N. W. 465); *In re Mitchell's Estate,* 178 Mich. 493 (144 N. W. 850).

Judgment is affirmed.

McALVAY, C. J., and BROOKE, KUHN, STONE, BIRD, and STEERE, JJ., concurred with MOORE, J.

OSTRANDER, J.  I think the estate should be held liable as upon an implied assumpsit.