GUY *v.* CINCINNATI NORTHERN RAILROAD CO.

1. MASTER AND SERVANT—PERSONAL INJURIES—INDEPENDENT CONTRACTOR—EVIDENCE—SUFFICIENCY.

   In an action by an employee of a railroad to recover for injuries sustained as the result of the starting of machinery in a coal dock used for loading coal on engines, where the foreman in charge, in addition to his yard duties, had a contract with the company for loading coal and hired and paid plaintiff, evidence *held*, insufficient to show that such foreman was an independent contractor.

2. SAME—INTERSTATE COMMERCE.

   One who is engaged in coaling and placing water in tanks of engines used in interstate commerce, among other duties, is engaged in interstate commerce.[1]

3. SAME—JOINT TORT FEASORS—RELEASE—EFFECT.

   The release of a foreman who is in charge of a railroad coal dock from liability for negligence in injuring another employee is not a defense in an action for damages for personal injuries against the railroad.

4. DAMAGES—PERSONAL INJURIES—EXCESSIVE VERDICT.

   A verdict for $35,000 in favor of a railroad employee for the loss of one arm below the shoulder and the other at the wrist and other injuries, *held* not excessive.

[1]For authorities passing on the question as to State regulation of relation between railroad companies engaged in interstate commerce and their employees, see notes in 15 L. R. A. (N. S.) 134; 29 L. R. A. (N. S.) 240; 52 L. R. A. (N. S.) 266.

Error to Lenawee; Hart, J.   Submitted June 27, 1917.  (Docket No. 80.)   Decided September 27, 1917. Rehearing denied December 28, 1917.

Case by Leo Guy against the Cincinnati Northern Railroad Company for personal injuries.   Judgment for plaintiff.   Defendant brings error.   Affirmed.

*Herbert R. Clark*, for appellant.

*Alonzo H. Ranes*, *Corinne L. Rice*, and *Earl C. Michener*, for appellee.

MOORE, J.   The questions involved in this case are clearly stated in the charge to the jury, of the trial judge, from which we quote:

"It is the further claim that the plaintiff, Leo Guy, was, on the said 18th day of January, 1914, a resident of the city of Hudson in this county; that on that date and prior thereto he was in the employ of the Cincinnati Northern Railroad Company in the city of Hudson; that his work and duties consisted of coaling engines that were engaged in interstate commerce between the State of Michigan and the State of Ohio as above set forth, in placing water in the tanks of said engines, and of assisting in cleaning the ash pans of said engines, keeping up the fires in engines that stopped at this station overnight on their way from the State of Michigan to the State of Ohio, oiling said engines, and operating the switch allowing said engines to pass from the main track onto the side tracks and from said side tracks back onto the main line, for the purpose of placing water in the tanks of said engines to be used in said interstate commerce. * * *

"Plaintiff further claims that during all the time Leo Guy was engaged in said work he was under the direction of a boss or foreman, C. E. Duvall, who was an agent or vice principal of said defendant, and that in the absence of the said Duvall he was under the control and direction of Emil Morgret, said Morgret being also in the employ of the said defendant.   Plaintiff further claims that there was being maintained by the said defendant a certain elevator or coal dock located on the right of way of the said defendant in said city of Hudson and where plaintiff was working,

which was used for the purpose of elevating coal up and into a certain hopper by the means of steam power, and from said hopper into and through a certain chute into the tenders of said engines engaged in an interstate commerce, as heretofore set forth.

"Plaintiff further claims that on said date, January 18, 1914, said C. E. Duvall ordered the plaintiff to go to the top of said tower, and to spread about the coal in said hopper at the top of said tower, and that in doing so it became necessary to ascend a ladder to or near the top of the tower, and to cross upon and over a certain platform, which was of a width of about 14 inches, said platform being unprotected by any railing, and that near said platform there were located certain cogwheels, and that it was necessary for plaintiff in going to said hopper for the purpose of arranging the coal to pass near said cogwheels, and that said cogwheels were unprotected by any covering or guard, and it is further alleged that at said time it was snowing and blowing and very cold, and that while plaintiff was passing, or attempting to pass, over said platform in pursuance of said negligent order of the said Duvall, he necessarily and unavoidably passed in close proximity to said cogwheels, and while passing said cogwheels the machinery was negligently and suddenly put in operation by the said Duvall without any warning, and by reason thereof plaintiff was caught in the machinery of said cogwheels, and that his left arm and right hand were mangled and crushed and his left jaw was fractured in three different places. Plaintiff further alleges that he was compelled to remain at the top of said tower for a period of one-half or three-quarters of an hour, during which time he suffered great pain and agony by reason of said injuries, and by reason of the severe cold; that he was then lowered by means of a canvas and rope to the ground and taken to a hotel near by; that a doctor was called, and upon examination amputated his left arm just below the shoulder and his right arm at the wrist, and an attempt was made to set the broken jaw and lacerations sutured. * * *

"Plaintiff further claims that at the time he was taken from the hospital in the city of Adrian, as above set forth, he was suffering with pains in his head and other parts of his body; that he was in a weakened

condition, both mentally and physically, and while in that condition he was taken from said hospital to the city of Hudson in company with C. E. Duvall, and taken into the office of an attorney in the city of Hudson, and that while in said office a certain alleged release was prepared, which purported to release the said Duvall from all liability by reason of the said injuries that he had sustained as above set forth, and that said release was signed by plaintiff's mother, and that the said Duvall paid to plaintiff's mother, Mrs. H. P. Bangs, the sum of $75, and executed and delivered to his said mother, Mrs. H. P. Bangs, two notes, one for the sum of $50, payable in 90 days, and one for the sum of $75, payable in one year from the date of execution. Plaintiff further claims that he received no part or any of the moneys paid by the said Duvall by reason of said alleged release, and that he did not, and could not by reason of his condition as above set forth, authorize his mother, Mrs. H. P. Bangs, to sign or execute said release. Plaintiff further claims that the said C. E. Duvall for the purpose of securing the alleged release, represented to his mother, Mrs. H. P. Bangs, that he, the said Duvall, was the employer of the plaintiff, and that plaintiff had no rights as against the Cincinnati Northern Railroad Company, and that he, the said Duvall, was insolvent, and that if she did not accept the money according to the terms of the alleged release, the plaintiff would not be able to recover any money, and that the said Mrs. H. P. Bangs, believing and relying on the said statements signed this alleged release.

"Plaintiff further claims that the alleged release is void under section 5 of the Federal employers' liability act [Act April 22, 1908, chap. 149, 35 U. S. Stat. (U. S. Comp. Stat. 1916, § 8661)] under which act this claim is brought, and which reads as follows:

"'Any contract, rule, regulation or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this act, shall to that extent be void: *Provided,* That in any action brought against any such common carrier under, or by virtue of any of the provisions of this act, such common carrier may set off therein any sum [of money] it has contributed or paid * * * to the injured employee, or the person entitled thereto on account of the injury or death for which said action was brought.'

"Plaintiff further claims that the so-called independent contract alleged to exist between Duvall and the plaintiff was a device, the purpose and intent of which was to enable the defendant to exempt itself from any liability created by this act, and is void under the said section 5 of said act.   *   *   *

"Now, gentlemen, that in substance is the claim of the plaintiff in this lawsuit. On the other hand, the defendant claims that plaintiff was not in its employ at the time of the accident; that plaintiff was in the employ of Edwin Duvall, an independent contractor, at the time of the accident; that plaintiff was not engaged in interstate commerce at the time of the accident; that plaintiff assumed the risk of being injured in going upon the platform of the coal dock near the cogwheels; that the accident was not due to any negligence on the part of the defendant; that the accident was due entirely to the negligence of plaintiff himself; that a settlement was made with and release given to Edwin Duvall by the plaintiff, and that such settlement and release constitutes a bar to this action; that under the pleadings and proofs, plaintiff has not made a case against defendant such as to entitle him to recover in this action.

"Defendant claims that the coal dock in question was constructed, owned, and operated by Edwin Duvall, under and by virtue of a written contract entered into between him and the defendant, which written contract consists of two letters   *   *   *   It claims that the said Edwin Duvall hired the men who worked on said dock, and paid them for such work.

"Defendant claims, further, that the plaintiff was never hired by it in any capacity, that his name was never upon its pay rolls, and that it never paid him nor became obligated to pay him for any such services performed. Defendant claims that the said Edwin Duvall was what is known under the law as an independent contractor, and that as such he hired the plaintiff and paid him for his services. Defendant claims that if it was the duty of any one to furnish a safe place for plaintiff to work, any such duty was that of Edwin Duvall, who constructed, owned, and operated the tower in question upon land which defendant had leased to him.

"Defendant claims, further, that it was no part of the duty of plaintiff to assist in transferring coal from the tower to the tenders of engines, and that that was no part of the work required to be performed by the said Edwin Duvall under the terms of said contract. Defendant claims that plaintiff was warned not to go up to the platform where he was injured, and when so told answered, 'All right' or words to that effect.

&ast; &ast; &ast;

"Defendant claims further that the accident occurred through the negligence of plaintiff alone. It claims that plaintiff stated to Edwin Duvall several times after the accident that he, Duvall, was not to blame for it, and that if he, plaintiff, had done as he was told, he would not have been injured, or that in substance, and that he made the same statement to other witnesses at different times.

"Defendant claims further that plaintiff made a settlement with the said Edwin Duvall for all damages on account of the injuries he received at the time in question, and that a release was executed by him, or for and in his behalf, with his authority, by his mother, Mrs. H. P. Bangs, said release being first discussed and read aloud in his presence, and that such release and full payment thereunder was a satisfaction for all his said injuries.   &ast; &ast; &ast;

"It is upon these conflicting claims, gentlemen, that you are to pass, and you are to determine from the evidence and under these instructions who is in the right and who is in the wrong in this matter.

"This is an action which is brought by the plaintiff under what is known as the Federal employers' liability act (35 U. S. Stat. chap. 149, §§ 1, 3, 5 (U. S. Comp. Stat. §§ 8657, 8659, 8661). You are instructed that at the time the plaintiff claims to have received his alleged injuries, a statute of the United States was in force in this State and in all of the other States, and that such statute reads in part as follows:

" 'That every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States and Territories or between the District of Columbia or any of the States or Territories and any foreign nation or nations, shall be liable in

198—Mich.—10.

damages, to any person suffering injury while he is employed [by such carrier in such commerce, if the injury is caused] in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency due to its negligence, in its cars, engines, appliances, machinery, tracks, roadbed, works, boats, wharves or other equipment.

" 'That in all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this act to recover damages for personal injuries to an employee the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee.

" 'That any contract, rule, regulation or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this act, shall to that extent be void.' * * *

"You are instructed that the defendant was at the time of the alleged injury engaged in interstate commerce; that is, the railroad company. You are also instructed that if you should find that the plaintiff was at the time of the injury engaged in leveling coal or was going to the bin for that purpose, this work would be so closely connected with and a part of interstate commerce that it would be considered within the law, in the opinion of the court, as being engaged in interstate commerce. Therefore the first question for you to ascertain is whether the plaintiff at the time of the alleged injury was proceeding to the coal bin under orders and directions for the purpose of leveling this coal off. * * *

"If you find under this instruction then that the plaintiff satisfied you by a preponderance of the evidence that he was at the time of the injury engaged in interstate commerce work, then the plaintiff must next satisfy you by a preponderance of the evidence that he was at the time of the alleged injury in the employ of the defendant, the Cincinnati Northern Railroad Company. You are instructed that if the plaintiff was in the employ of Edwin Duvall as an independent contractor, and not in the defendant's employ, he cannot recover in this action.

"You are also instructed that even if the plaintiff

was engaged in interstate commerce work at the time of the accident, he could not recover in this action unless he was in the employ of the defendant at the time it occurred.

"You are instructed that the defendant would have a legal right to enter into a contract with Edwin Duvall, and would have a right to delegate to him by a contract the right to construct the dock in question and the work of operating and control of the same, if you find under the evidence that the defendant did do so. But even at that, if the plaintiff was in the employ of the defendant, then you have a right to proceed with your inquiry.   *   *   *

"If you find from all the evidence that the plaintiff has satisfied you by a preponderance of the evidence that he, at the time of the injury, was in the employ of the railroad company, then you will continue your inquiry.

"On the other hand, if he hasn't satisfied you, that will end your inquiry, and your verdict will be, 'No cause of action.'   *   *   *

"You are instructed that if the plaintiff at the time of the alleged accident was in the employ of the defendant, then it was the duty of the defendant to exercise ordinary care for the safety of the plaintiff, and you are further instructed that ordinary care, as used in these instructions, is that degree of care which a reasonably prudent man would exercise under the same or like circumstances.

"You are instructed that if the plaintiff was in the employ of the defendant and was directed by a foreman of the defendant acting within the scope of his authority to go upon the tower or elevator, and if you find that the giving of such orders was a failure to use that degree of care which a reasonably prudent man would have exercised under the same circumstances, then this would be negligence.

"You are also instructed that if you find that the plaintiff was employed by the defendant and that his work required him to work around a place which was not reasonably safe, in that there was an unguarded platform or unguarded cogwheels, and the defendant required the plaintiff to work in such a place, then this would be negligence. However, if the platform

was reasonably safe without barriers, if you should find it had none, or if the cogwheels were reasonably safe without guards if you should find that they had none, then this would not be negligence.   *   *   *

"Then if you find under these instructions and evidence that the defendant was negligent and you will continue your inquiry. However, if you find that the defendant was not negligent, and that it did all that a reasonably prudent man would do under like circumstances, then the defendant would not be negligent, and that would end your inquiry, and your verdict would be, 'No cause of action.'   *   *   *

"You are instructed that if you find the defendant was negligent, and you also find that the plaintiff was guilty of contributory negligence, that is that the plaintiff was guilty of doing something or omitting to do something which he should have done, by the test of what a reasonably prudent man would do under the same circumstances, and which if he had omitted to do or done, the injury would not have happened, yet this would not bar the plaintiff's recovery; neither would it bar the plaintiff's recovery if the injury was caused by the negligence of a fellow servant. However, if you find that the plaintiff was guilty of contributory negligence, that he was to blame some, that he didn't do his part in the matter, you should take this into consideration in estimating the damages if you find he has suffered any, and you should diminish his damages in proportion to the amount of the negligence which you attribute to him.   *   *   *

"Then if you find that the plaintiff has established all of the elements that I have so far outlined which it is necessary for him to establish before he can recover, you will then proceed and inquire whether the plaintiff assumed the risk of the employment. If the injury resulted from what is known as an assumed risk, plaintiff cannot recover. You are instructed that whoever hires out for any service assumes those risks which properly belong to the employment. The servant assumes all the dangers that are obviously incident to the employment, which dangers he knows, or should know. You have a right to consider in fixing the liability here whether the railroad company furnished another way which was safe to get to this coal

bin without going by the cogwheel, and if it did, and plaintiff knew it, or should have known it, by the exercise of ordinary caution, and plaintiff picked out his own way, which was not the way to be used, and which was not the ordinary way that was used, the plaintiff assumed the risk of going the way he did, and cannot recover.   *   *   *

"You are instructed that before the plaintiff can recover he must establish by a preponderance of the evidence the following elements: (1) That he at the time of the accident was engaged in interstate commerce work; (2) that he was in the employ of the company at the time of the accident; (3) that the defendant was negligent; (4) that the negligence of the defendant was the proximate cause of his injuries; (5) that he has been injured; (6) that the injury was not assumed by him by virtue of his employment, and was not such as is known as an assumed risk.   *   *   *

"You are instructed that there has been some evidence in this case tending to establish a settlement by Edwin Duvall with Leo Guy for his injuries. This evidence is to be considered by you in determining the question as to whether Leo Guy was working for the railroad company, or whether he was working for Edwin Duvall at the time of his injury. That is, if you find the release was authorized and made when the plaintiff was competent and that he understood it or ratified the signing of it, you will take this release as bearing on the question of who hired him, whether the railroad company did, or Edwin Duvall. If you find he was working for the railroad company, however, I do not believe under this act of congress that the railroad company could escape its liability by reason of the injury, if you find it is liable by reason of a settlement made by Leo Guy with Edwin Duvall, even if you should find it was knowingly made and understood, because it would seem to me that this would be a device by which the purpose of the statute could be nullified and avoided. Of course if it wasn't knowingly made or ratified and was done by fraud and deceit, it would not be any settlement or release. If, therefore, you find under the evidence and these instructions the plaintiff is entitled to recover from the railroad company, you will not consider this receipt

as diminishing liability, if any liability is once established against the railroad company."

The jury returned a verdict for $35,000 in favor of the plaintiff. The case is brought here by writ of error.

The assignments of error are grouped in the brief of appellant as follows:

(1) Was the plaintiff in the employ of defendant at the time he was injured?

(2) Was plaintiff engaged in interstate commerce at the time he was injured?

(3) Was defendant guilty of negligence?

(4) Did plaintiff assume the risk?

(5) Does the release plaintiff gave Edwin Duvall bar recovery?

(6) Is the verdict against the weight of the evidence?

(7) Is the verdict excessive?

It was stated on the oral argument by counsel for appellant that the controlling questions are 1, 2, and 5, and in considering these it is necessary to go into the testimony at some length.

It is claimed by the defendant that one Duvall was acting in a dual capacity; that while he was foreman of the yards of defendant at Hudson, he was also an independent contractor. To establish the last proposition two letters were introduced in evidence reading:

"Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.
"VAN WERT, O., July 1. '13.
"MR. E. DUVALL,
    "Hudson, Mich.
    "*Dear Sirs:* Confirming the understanding between us in my office last week:
    "If you build the hoist at Hudson, it is understood that we are to pay you 11c per ton for handling the coal, the Cincinnati Northern to furnish the coal for operating the hoist and if the coal used for this purpose amounts to more than three-fourths of a ton daily, the price of hoisting the coal will be reduced from 11c to 10c per ton. Bryan scale weights will

govern in determining the amount of coal handled, if the coal is weighed at Bryan, and if it is not weighed there, billed weights will govern.  If you are required to unload five or more straight flat bottom cars in one month, you will be paid 13c per ton for the number of flat bottom cars unloaded but if you unload less than five flat bottom cars in one month, the regular rate will apply to the flat bottoms as well as the hopper bottoms.  You are to pick up all coal that falls to the ground.  You are not to be held to this agreement if it is found that the hoist cannot be operated successfully, but you will bear the burden that results from a failure of a day or two.  There is no understanding that we will continue this method of handling coal beyond the first of June, 1914.

"Have I outlined your understanding of our conference?

"Yours truly,

"J. V. KENNEDY."

"The Cincinnati Northern Railroad Company.

"HUDSON STATION, July 6, 1913.

"MR. J. V. KENNEDY, Supt.

"*Dear Sir:* Referring to your letter on date of July 1st relating to our agreement about handling the company coal at Hudson.  Everything is all right and I will accept this letter as our contract.  Work is progressing nicely with the new dock and hope to have same in operation by the first of the month.  Thanking you for the interest you have taken in this in my behalf as well as that of the company,

"I am yours truly,

"E. DUVALL."

Mr. Duvall claimed there was a lease made later, but it was not produced upon the trial.

It is not claimed that plaintiff had any knowledge of this correspondence.  It is claimed by the plaintiff that no authority was shown on the part of Mr. Kennedy to write the letter, and it is also claimed that if it is conceded a contract was made, it is against public policy.  It will be noticed that the correspondence does not show how much coal is to be handled, or what is to be done in handling it, how many cars, who is to

direct their placings, and after the coal is hoisted what is to be done with it; if to be used in coaling locomotives, who is to direct the placing of them and the times of coaling. The correspondence is silent as to these and other details. As to what was actually done, the testimony offered by the plaintiff in part is as follows:

"Morgret, Emil. Am employed by the Cincinnati Northern Railway Company. I was employed by that company January 18, 1914, when the accident occurred. I got acquainted with Leo Guy during that month. I met him at the Cincinnati Northern Railway Company coal dock. He had been working there about a week. I had been there almost 2 years.

"We elevated coal on the coal dock with a machine built there on the Cincinnati Northern Railway Company's land. It was about 40 or 50 feet high, and just about square at the base. * * * There is also a water tank located there on the right of way about 50 feet south of the coal dock, on the same side of main track as the elevator, and between the main track and switch track. The water tank is about 8 feet from the main track. There were also a couple of box cars there that we used for an office and storeroom; oil, corncobs, wire, kegs and sand are stored there. The main line extends from Jackson, Mich., to Franklin, Ohio.

"Edwin Duvall was a foreman there in charge of elevating coal and water into the engines. He was there all day and sometimes in the evening. When he was not there I was in charge. Leo Guy and Bert Elliott both worked there about January 18, 1914, the day of the accident, and the week previous to that. Leo Guy elevated coal. He opened the door of the cars and let the coal down into a hopper, and then it would be conveyed across into the endless chain and elevated up into the hopper above. He saw that the coal went down into the hopper and shoveled it out. We used a threshing machine engine to furnish power. After the coal was elevated into the hopper, it was put on the locomotives when they came by there. When a car would come up there or a locomotive en-

gine, Leo Guy would release the clutch and let the spout down, and the coal would run out on the engine or tender. The fireman and engineer would generally be on the engine. The engines that we coaled came from Ohio, and were going north to Jackson, Mich., or came from Jackson, Mich., and were going south into Ohio. There was one freight train that was a short local run from Hudson to Jackson only. Outside of that all other trains went from Ohio into Michigan or Michigan into Ohio. When a locomotive engine or tender was there for coal the fireman of the locomotive engines would tell Leo Guy when to let the spout down or up. These locomotive engines were going from Ohio into Michigan or from Michigan into Ohio. * * *

"In addition to the work of elevating this coal, there was a couple of engines there we had to tend each night. One came from Ohio and the other from Michigan. The one coming from Michigan would go to Ohio the next day, and the other one had to come from Ohio. At night we put sand, water, and coal on those engines. Leo Guy assisted in that work a part of the time. Generally sent him to open the switch and send the engines south on the main track. When they had run the engines by the switch he would turn the switch back and lock it and get on the back of the engine. After that he would get on the tank and go and draw water in the tank. He would generally pull down the spout of the water tank and draw water. After the tank was filled, he would hang up the spout and go back onto the side track again, and turn the switch. He used to hoe the ashes out of the ash pan of the locomotive engines. If Mr. Duvall wasn't there, this was done under my direction. He also carried sand up on the engine and put it on the sand box. The sand kept the wheels from slipping on the rails. He also filled the oil cans with oil, and put them back on these locomotives. These locomotives, when they left for Ohio, hauled box cars and coal cars. I have seen coal cars go by, and have seen threshing machines hauled. Leo Guy helped keep fires up on those engines at night. The next morning when the engineers came down these engines would have the steam all up for the purpose of going out and taking their trains.

"When Mr. Duvall was present he assisted in the work that I have named over. He ceased working there about 14 months ago. I took Mr. Duvall's place. I got my pay from the Cincinnati Northern Railroad Company. I also got it from the Cincinnati Northern Railroad Company before Mr. Duvall left. I do the same work now that Mr. Duvall did before he left. I was present a couple of times when Mr. Duvall got his pay; he got it from the Cincinnati Northern Railroad Company."

On cross-examination in part:

"I worked there nights. Leo Guy worked part of the time nights and part of the time daytimes. Besides Leo Guy and myself Bert Elliott worked there. I think another man came to Hudson with Guy and was also employed there, but I don't remember his name.

"*Q.* Now, at the time you worked for the Cincinnati Northern Railroad Company?

"*A.* Yes, sir.

"*Q.* And did you also work for Mr. Duvall?

"*A.* I worked under his instructions; he was there.

"*Q.* Did you work for him?

"*A.* Yes; I done whatever there was to do there.

"*Q.* You were paid by both were you not?

"*A.* Not at that time.

"*Q.* Were you paid by the Cincinnati Northern Railway Company?

"*A.* Yes, sir.

"*Q.* To do work for the company, and paid by Mr. Duvall to do the work for him?

"*A.* Not at that time.

"*Q.* Not at the time of this accident?

"*A.* No, sir.

"*Q.* You are sure about that, too, are you, Mr. Morgret?

"*A.* Yes, sir."

On redirect examination in part:

"*Q.* Before Leo Guy worked at this place, how long had you been working there?

"*A.* About two years.

"*Q.* Were you carrying on the same kind of work during the two years prior to the time Leo Guy worked

there that you were during the time Leo Guy did work there?  Were you doing the same kind of work?

"*A.* Yes, sir.

"*Q.* State about when, if you remember, that you received your communications from the defendant here, the Cincinnati Northern Railway Company, by message.  *  *  *

"*Mr. Ranes:* (Question read) with reference to coal being furnished by you there for those engines?

"*A.* I don't believe I can just tell.

"*Q.* Fix the date as near as you can.

"*A.* We got some long before this accident and got some after.

"*Q.* About how long were those last ones you remember received, either by phone or message before this accident?

"*A.* Just about a month I should judge.

"*Q.* I will ask you what did those messages state?

"*A.* It took a little bit longer than the time they thought it would to coal the engines, and they wanted to know what was the reason, and we simply told them we had a little trouble with the dock at the time, and there was a little delay in getting the coal on the engine."

"Bert Elliott: My business is day work.  I had been working off and on at the coal dock, where Leo Guy was working before January 18, 1914.  I had been working there a couple of days before the accident happened.  I worked some days and some nights.  Leo Guy worked there while I was working.  I was working for the railroad company under Mr. Duvall's instructions.  I got my money in checks from the Cincinnati Northern Railway Company at the depot.  Mr. Morgret worked some nights and some days when I was there.  Ed Duvall was boss or foreman; when he was not there Emil Morgret was in charge.  When Duvall was there I worked under him, and when he was away I worked under Emil Morgret.  I have been working at the coal dock off and on since it was built.  I helped to do the first work.  The week Leo Guy was working there we unloaded coal nights from the Cincinnati Northern Railway Company trains into the hopper, and elevated it up in that tower.  After it was elevated it was put on the coal tenders or engines.

The engines were bound from Ohio to Jackson, Michigan, or from Jackson, Michigan, to Ohio. The engine would come up and stop, and the fireman would call for coal, and we would give him coal. We would untie a rope over a hook set there and let the spout down and let coal into the tender. Leo Guy and I both did that work. When they had enough coal on the engine the fireman would give the signal. I drew the ashes from the ash pan underneath the engine. I have seen Leo Guy do that. I also put on sand and sifted it for the engines. It is used for a brake on the rails of the Cincinnati Northern Railroad Company. We also worked and cleaned up loose coal around the dock. We also run engines out to get water. Leo Guy always turned the switch, and always pulled the rope to the spout to get water from the tank; pulled it down to the tender. The water would then come out of the tank into the tender of the engine. These engines ran from Ohio into Michigan, and from Michigan into Ohio. Leo Guy worked underneath the engines, cleaned out the ash pans and oiled it, got the oil cans ready and the lanterns and such things. He cleaned and filled the lanterns and put them on the engines. The engineer and fireman of the engines took the lanterns with them. * * *

"I was present at the time Leo Guy was injured. Mr. Duvall was also present. On that day Leo Guy and I were both upon that platform. The belt came off, and we went up to put the belt on. Mr. Duvall directed us to go up there. Mr. Duvall had started the machinery several times, and the belt came off, and we put it back on. When Leo Guy first got up there I think the machinery was standing still. At the time he was injured I had just gone down to the lower part beneath the dock. I was close to 50 feet below Leo Guy. While I was there and he was up there, the machinery came to a stop and started on. Before that time it had been running until I got down to the ground. When it started up I noticed a check of the motion of the machinery, and it stopped. I heard somebody holler and went out and seen. When the machinery was started up, I don't remember now if I heard any warning given or anything said to me or Leo Guy that the machinery was going to be start-

ed. When I felt the machinery kind of stop and heard the scream, we ran out and looked to see what it was, and we see him hanging up there. I was down in back when I heard this cry. I never saw Leo Guy on that dock before as I remember of. * * * Prior to this accident we were unloading cars there. Leo Guy and I were both working at the same thing, to get the coal out of the cars into the hopper and elevate it above."

"Leo Guy: I was 29 the 28th of last October. I was located at Hudson, Mich., January 18, 1914. I now reside at the Cook County Poor Farm, Cook County, Ill. January 18th and some time prior thereto I was working for the Cincinnati Northern Railroad Company at the coal dock at Hudson, Mich. I went to work there the Sunday morning before I got hurt on the following Sunday. When I made application for this position or work I went down to see the foreman, Ed Duvall. On that Sunday I went to work somewhere near 8 o'clock or 9 o'clock in the morning, and worked that day and all that night, and the next day. They gave us a couple of hours' rest in the little box car office that was there.

"January 18, 1914, we were working around there, and there was a belt come off, and we went up and put the belt on and got it fixed on the wheel, and went down, and Duvall told me to go up on top and level off the coal in the bin, to level it off good so we can get lots of coal up there. He expected some more trains in there, and we would need lots of coal. On that day I had been working one week. I went to work that day about 6 o'clock in the morning. Before that we quit work the night before. During the daytime when I worked there Mr. Duvall was boss or foreman over me. When I worked there of an evening Mr. Morgret was boss or foreman.

"Q. State when you went to work there on Sunday, tell us just what work you were doing—the kind of work.

"A. The machine was broke down when I went there and— The machinery was broken down, and we had to shovel coal into buckets and then move the buckets with a crank outside so we could put more buckets up against the side of the car and keep the buckets

firm so we could coal the engines running from Ohio into Michigan and from Michigan into Ohio.

"*Q.* What else did you do there besides coaling; tell us all the work you did?

"*A.* At nighttime when I was assisting in the work with Mr. Morgret I was told to sand the engines, clean the oil cans, fill them with oil, and put them on the engine.

"*Mr. Clark:* Just a moment. State who he was told by.

"*A.* I said Mr. Morgret.

"*Mr. Ranes:* By whom were you told?

"*A.* I was told by Mr. Morgret.

"*Q.* To do what?

"*A.* To fill oil cans, put them on the engines, carry sand from the dry sand pile, and put it on the engine.

"*Q.* What else did you do there besides that?

"*A.* I went and opened the switch, and let Mr. Morgret with the engine on the main track from the switch track and closed the switch, climbed on the engine, went down and got off the engine, unloosened the rope that held an iron cable that we had attached to the chute of the coal dock, and let the coal go into the tender of the engine. * * *

"*A.* From Michigan to Ohio and from Ohio to Michigan.

"*The Court:* Were the trains actually going through, or didn't you get ready for the trains to go out in the morning?

"*A.* Ready to go out in the morning. * * *

"*Q.* What was done to the engines while they stopped there?

"*A.* They were cleaned, sanded, cleaned ashes out of pan.

"*Q.* Who did this?

"*A.* Myself and Mr. Morgret.

"*Q.* Under whose direction did you do it?

"*A.* Mr. Morgret's.

"*Q.* Tell us all that was done to the engines while stopping there?

"*A.* Cleaned, sanded, took ashes out from under the engine with a long scraper, cleaned the oil cans, put them on the engine, filled them full of coal and water,

and had steam up so they were ready to go out the next morning.  *  *  *

"Q. And under whose direction?

"A. Mr. Morgret's.

"Q. In addition to that, what did you do while working there, if anything?

"A. Elevate coal.  *  *  *

"Q. After you got this coal up there and into this hopper, what did you do with it?

"A. Put it in the tender of the engines.  *  *  *

"Q. What fireman?

"A. The fireman of trains coming in there, the locomotive fireman.

"Q. What did he do?

"A. He would come up on top of the tender, and would give the signal to the engineer to stop the train, and when he would get into the position he wanted it, he would say, 'All right,' and I would release the rope and let the chute down and let the coal fall out of that bin or hopper, as we called it, into the tender of the engine. Then he would say, 'That is enough,' and I would put the chute back up again until he moved the engine probably a few feet. Then he would say, 'Give me some more,' and I would let the coal down again and level it up so it was nice and level on the tender.

"Q. Is there anything else you did there?

"A. Yes, sir; I dried sand.

"Q. What was afterwards done with that sand?

"A. Put in a sand tank on the engine."

The witness described in great detail the accident, and the extent of his injuries. He denied that he had knowingly settled for his injuries, or that he had authorized anybody else to do so.

In view of the exceedingly meager statement in the alleged contract of what Mr. Duvall was to do, and in view of what was actually done in handling the coal, and the other work which was done by the plaintiff and by his co-worker Mr. Elliott, and by the assistant foreman, Mr. Morgret, we do not think the court erred in declining to direct a verdict for the defendant on

the theory that plaintiff was at work for an independent contractor. The jury having found plaintiff was in the employ of the defendant, it necessarily follows under the proofs that he was engaged in interstate commerce. We think it also follows that what was done by way of settlement with Mr. Duvall is not a defense to this action, against the railroad company.

The other assignments have been considered. We think them without merit.

Judgment is affirmed, with costs.

KUHN, C. J., and STONE, OSTRANDER, BIRD, STEERE, and BROOKE, JJ., concurred. FELLOWS, J. did not sit.