MISSOURI, K. & T. RY. CO. OF TEXAS v. SMITH. (No. 1365.) †

(Court of Civil Appeals of Texas. Texarkana. Dec. 24, 1914. Rehearing Denied Jan. 7, 1915.)

1. DAMAGES (§ 158*) — PERSONAL INJURY — PLEADING AND PROOF.

Evidence that by his injuries plaintiff was rendered impotent is proper when the petition alleges that the accident had affected the plaintiff's brain "and other organs," where defendant had made no offer to require the plaintiff to specify what other organs; since a general allegation of damage will let in evidence of such damage as naturally and necessarily results from the wrong charged.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 441–444; Dec. Dig. § 158.*]

2. TRIAL (§ 273*) — INSTRUCTIONS TO JURY — OBJECTION TO—WAIVER.

Under Acts 33d Leg. c. 59, § 3 (Vernon's Sayles' Ann. Civ. St. 1914, art. 1971), objections to the charge not made before it had been read to the jury must be regarded as waived.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 680–682; Dec. Dig. § 273.*]

3. MASTER AND SERVANT (§ 276*)—INJURY TO RAILROAD EMPLOYÉ—EVIDENCE.

Evidence held to justify findings that plaintiff's injury was caused by negligence of defendant railroad company in moving an engine against the tender under which plaintiff was at work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–952, 954, 959, 970, 976; Dec. Dig. § 276.*]

4. MASTER AND SERVANT (§ 217*)—INJURY TO SERVANT—ASSUMPTION OF RISK.

A servant does not assume the risk of injury from negligence of the master of which he is ignorant.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

5. DAMAGES (§ 185*)—CAUSE OF CONDITION—RESULT OF ACCIDENT—EVIDENCE.

Evidence held sufficient to show that plaintiff's condition of health was the result of the accident complained of.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 503–508; Dec. Dig. § 185.*]

6. DAMAGES (§ 132*)—PERSONAL INJURY—REDUCTION AS EXCESSIVE.

Judgment for $50,000 in suit for personal injuries, though resulting in impotency, paralysis of the left side, probable shortening of life, and probable permanent disability for all work,

was grossly excessive in case of a foreman of a railroad track gang, 32 years old, requiring a reversal unless a remittitur of the excess above $20,000 be filed.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 372–385, 396; Dec. Dig. § 132.*]

Appeal from District Court, Harrison County; H. T. Lyttleton, Judge.

Suit by C. Smith against the Missouri, Kansas & Texas Railway Company of Texas. From a judgment for $50,000, defendant appeals. Judgment reversed, and cause remanded, unless a remittitur of $30,000 be filed within 20 days.

This was a suit by appellee against appellant for damages for personal injuries, in which judgment was rendered for appellee for $50,000.

Appellee alleged and proved that on July 19, 1913, an engine and its tender belonging to appellant having become derailed, he, in the discharge of his duty as one of appellant's employés, and in compliance with the order of one Taylor, appellant's roadmaster, who was superintending the work necessary to be done to replace said engine and tender on the track, went under said tender to rearrange the brake thereon, and that while he was engaged in doing so the tender so moved as to cause injury to his person. He alleged that the movement of the tender was due to negligence on the part of appellant, and then further alleged as follows:

"Plaintiff shows that the said tender and appliances under the same caught the plaintiff and crushed him against the ground, badly injuring and bruising the plaintiff's back, leg, and side, wrenching, bending, and curving his back and spine, and injuring and bruising his entire person, inflicting upon him many external and internal bruises and injuries, all of which are permanent in their character, and from which the plaintiff will never recover, and which have totally incapacitated the plaintiff from engaging in any work or labor of any kind or character whatever, and which will totally incapacitate the plaintiff from engaging in any work so long as he may live.

"That the injuries have caused progressive degenerative diseases of the spinal cord to set in, and have set up a degenerative process and condition in the plaintiff's brain and other organs, causing the plaintiff to have, among other afflictions and troubles, a partial paralysis of his left side, which plaintiff is informed and believes and here charges will be progressive in its course, and that same will totally incapacitate the plaintiff so long as he lives, and will in all reasonable probability materially shorten his life.

"That the said injuries, among other things, have caused a degeneration of the central nervous system, to the impairment of his mental capacity to such an extent as to seriously threaten his mental condition during all of his future life.

"That the said plaintiff before he was injured was an able-bodied man, in good physical and mental condition, and able to earn much money, and that he is now totally incapacitated by reason of the said injury to do or perform any manual labor, and that the said plaintiff will, by reason of his injuries, never be able to perform any manual labor so long as he may live; that he has suffered great mental and physical pain by reason thereof, and will continue to so suffer so long as he may live.

"The plaintiff shows that by reason of the said injuries he has been damaged for time lost, time that he will lose in the future, decreased ability to earn money in the future, inability of the plaintiff to move about and enjoy himself in the usual way, mental and physical suffering endured in the past and that will be endured in the future in the total sum of $60,000 actual damages."

The answer of the defendant included a general denial and pleas of contributory negligence and assumed risk.

As to the measure of damages in the event they found for appellee, the trial court instructed the jury as follows:

"You are instructed that, if you should find in favor of the plaintiff, then you will allow him such a sum of money as, if paid in cash at this time, will fairly compensate him for the injuries he has sustained by reason of the time he may have lost, if any, by reason of the said injuries, if any, decreased ability to earn money in the future, if any, by reason of the said injuries, mental and physical suffering that the plaintiff has endured, if any, and mental and physical suffering that he may endure in the future, if any, by reason of the said injuries, as a direct and proximate result thereof; and if you find that the plaintiff's ability to move about and enjoy himself in the usual way has been injured or diminished by reason of the injuries complained of in his said petition, then you will take into consideration that fact in estimating the damages which the plaintiff may be entitled to recover."

The testimony was sufficient to support findings involved in the verdict; that appellee, without fault on his part, suffered injury to his person, that same was due to negligence on the part of appellant as charged, and that appellee had not assumed the risk of the injury inflicted upon him; and we so find.

Schluter & Singleton, of Jefferson, Chas. C. Huff, of Dallas, and J. M. Chambers, of Ft. Worth, for appellant. S. P. Jones and Young & Robinson, all of Marshall, for appellee.

WILLSON, C. J. (after stating the facts as above). [1] By his own testimony and that of his wife appellee proved that, as a result of injuries he received, he was rendered impotent and incapable of sexual intercourse. His testimony was admitted without objection, but appellant afterward moved to strike same out, on the ground that the pleadings did not authorize it. The testimony of the wife was objected to when offered, on the same ground. It is insisted that the court erred when he refused to strike out the testimony of appellee and when he overruled the objection made to that of his wife.

The allegations in the petition relied upon as a sufficient basis for the rulings made are set out in the statement above. It will be noted that appellee averred that the injuries he suffered had caused "progressive degenerative diseases of the spinal cord to set in" and had "set up a degenerative pro-

cess and condition in the plaintiff's brain and ·other organs, causing plaintiff to have, among other afflictions and troubles, a partial paralysis of his left side," and, further, .that the "injuries among other things have caused a degeneration of the central nervous system to the impairment of his mental capacity," etc. No effort was made by exceptions interposed to the petition to have appellee to specify the "other organs" than the brain affected, nor the "other afflictions and troubles" than the paralysis suffered, as charged, because of the "degenerative process and condition" caused by the injury to the spinal cord, nor to specify the "other things" beside impairment of his mental capacity, alleged to have been caused by the "degeneration of the central nervous system."

The rule, as settled in this state, is:

"That a general· allegation of damages will let in evidence of such damages as naturally and necessarily result from the wrongs charged; but, to admit proof of damages which do not necessarily result from the injury alleged, the petition must set up the particular effects claimed to have followed the injury." Campbell v. Cook, 86 Tex. 630, 26 S. W. 486, 40 Am. St. Rep. 878.

In the application of this rule in the case cited, the Supreme Court held that allegations charging the injuries suffered by the plaintiff to be the "breaking and crushing the bones of his hip and thigh, tearing, cutting, and lacerating his flesh, bruising, wounding, and injuring him in his back, bowels, hips, legs, and other parts and members of his body," were not sufficient as a basis for testimony that the plaintiff's "capacity to have sexual intercourse with his wife was greatly impaired." The court said:

"There was no injury alleged to have been inflicted upon any organ or member of the body from which 'impairment' would naturally, not to say necessarily, follow."

In the application of the same rule the Supreme Court held in the later case of City of Dallas v. Jones, 93 Tex. 38, 49 S. W. 577, 53 S. W. 377, that allegations that the head, body and limbs of plaintiff's wife "were terribly injured and bruised, whereby her brain was affected, and her spine injured and rendered diseased, and whereby she was permanently and seriously injured, and caused to suffer great pain, mentally and bodily, and her nervous system was shocked and her health destroyed, and whereby he sustained loss of services of his wife to him and her children and family, and plaintiff was compelled to incur large sums of money for medicines and doctor's bills, and lost the comfort and services and society of his wife, who has been rendered a hopeless invalid, requiring constant service and attendance of her husband and others," were broad enough to admit testimony that the wife "could not stand sexual connection, and that, as it caused her pain, plaintiff did not enjoy it."

In the Jones Case, as in the Cook Case, there was no allegation of an injury to any organ or member of plaintiff's wife's body which one unacquainted with the relation and dependency of one part of the body on another or other parts thereof could say would either naturally or necessarily result in her incapacity to endure sexual intercourse. The practical difference between the two cases, we think, lies in the fact that in the Jones Case a physician testified that an injury to the spine, if it did not cause complete paralysis, frequently had the effect to "lower the nervous system," and, when suffered by the wife, "would be apt to cause conjugal relations to be unpleasant to her," and another physician testified that he thought the "sexual act would throw her . into spasms."

If the ruling in the Jones Case was based upon that point of difference, then it ought to be regarded as justifying the ruling made by the trial court in this case, for on the trial a physician (Dr. Wheat) testified as follows:

"This condition of impotency we find in this man (appellee), in my opinion, is due to the same trouble I have recited in the other cases; that is, damage to that part of the spinal cord that controls the power of erection. When a man has erection, that is controlled by a certain part in the spinal cord, and when you damage certain parts in the cord it destroys that altogether. The power of erection is not in the spinal cord, but the control of the power of erection is there. Yes; an injury to the central nervous system of sufficient severity will cause the loss of the power of erection. Yes; impotency is one of the natural things to follow an injury of that kind."

Appellant insists, however, that the allegations should not be considered in the light of such testimony, and in support of its contention argues as follows:

"Suppose that a pleader, in alleging an injury to the brain, should aver 'that the concussion totally destroyed the function of the fissure of Rolando.' The works on anatomy and surgery teach that such an injury must with absolute certainty result in the complete paralysis of all the extremities, and to the mind of one versed in those sciences such an allegation would convey the fact of such paralysis as a natural and necessary consequence of such alleged injury. That such would be the consequences of the injury is a matter of scientific knowledge, and not of general or common knowledge, and we submit that under our rules of pleading, liberal though they be, evidence of paralysis of the extremities would not be received. The legal inference of a fact from a given one only obtains where the laws of nature, as commonly understood, make it impossible for the one fact to exist without the other."

It seems to the writer that in the case supposed the evidence should be received as within the rule, if it was made to appear by expert testimony or otherwise that the paralysis was the "natural and necessary" result of the injury alleged. As˞he understands the rule, it is the fact that a given consequence naturally and necessarily follows an injury alleged that renders testimony that that consequence followed the injury admissible, and not the court's knowledge thereof. If the rule means that it must be a matter of common knowledge that a given consequence will naturally and necessarily follow an in-

jury alleged before testimony is admissible to prove such consequence, then it is a useless one, for it is never necessary to prove matters of common knowledge. Railway Co. v. Curry, 64 Tex. 88.

We are of opinion the assignments complaining of the action of the court with respect to the testimony in question should be overruled, and we think the conclusion reached is supported not only by the Jones Case referred to, but by rulings made in Railway Co. v. McMannewitz, 70 Tex. 73, 8 S. W. 66; Railway Co. v. Mitchell, 72 Tex. 171, 10 S. W. 411; Railway Co. v. Pina, 33 Tex. Civ. App. 680, 77 S. W. 979; Railway Co. v. McCutcheon, 33 Tex. Civ. App. 557, 77 S. W. 232; Railway Co. v. Edling, 18 Tex. Civ. App. 171, 45 S. W. 406; and others which could be cited.

[2] The instruction of the jury as to the measure of damages if they found in appellee's favor is set out in the statement above. It will be noted that the jury were told, if they found appellee's "ability to move about and enjoy himself in the usual way" had been "injured or diminished by reason of the injuries complained of in his petition," they should take that into consideration in estimating his damages. It is insisted: (1) That the part of the instruction just referred to was upon the weight of the evidence in "singling out and calling the attention of the jury specially to the issue of diminished ability to move about," etc.; (2) that damages for such diminished ability were not recoverable apart from lost time, diminished ability to earn money, and mental and physical suffering; and (3) that the effect of said part of the instruction was to authorize a double recovery for mental suffering endured by appellee. In his petition appellee alleged as one of the elements of the damages he had suffered his inability to "move about and enjoy himself in the usual way." No exception was interposed to the allegation. It is not necessary to inquire whether the objections or any of them are tenable or not; for they were not presented to the trial court before the charge was read to the jury, as required by the Acts 1913, p. 113, § 3 (Vernon's Sayles' Stat. art. 1971), and therefore must be regarded as having been waived. Railway Co. v. Wadsack, 166 S. W. 42; Railway Co. v. Brown, 168 S. W. 866.

[3] Appellant thought the testimony was not sufficient to support a finding that it had been guilty of negligence as charged, and requested the trial court to so instruct the jury. The refusal of this request is made the basis of the fifth assignment. The negligence alleged was the act of appellant in causing an engine under which appellee was working "to be moved, or negligently permitting the same to be moved, causing the same to move such a distance as to catch the plaintiff and bruise, injure, and crush his body." It appeared from the testimony that appellee, then about 32 years of age, was employed by ap-

pellant as foreman of a gang of men doing track work. He claimed to have been injured late on the morning of July 19, 1913. He and the men under him had been at work from about 6 o'clock of the afternoon of July 18th trying to get a derailed locomotive and its tender back on the track. In compliance with the order of one Taylor, appellant's roadmaster, who was present directing the work, appellee was under the tender, endeavoring to fix the brake rigging thereof, when, as all the witnesses agree, the engine and tender moved east—some of them said a distance of 2 or 3 inches, while others said a distance of 12 or 18 inches. Appellee's testimony as to his position at that time and as to the effect on him of the movement of the tender was as follows:

"After Mr. Taylor told me to go under there I went under to fix the brake rigging, and in doing that I lay on my back under the car, and had one foot propped up against the car with my feet towards Greenville and my head towards Shreveport, and had my head and shoulders back against the rail and blocks. The pin I was trying to get out of the brake rigging was about three feet from me there and I had to reach for it. While laying there my right foot was up on the tank bolster. I wanted to get the slack out of those rods, so I could get the pin out. I was in that position so I could get to it and give me strength to do that work. While I was there in that position the engine I was working under and the other engine hitched to it came back and pushed me back the way my head was. When it came back it curled me up against the block and rail, pushing my head back between the block and rail—that is, the block they used for blocking and cribbing to get the engine on. When it started back it just squeezed me."

On cross-examination appellee testified he did not know what caused the tender to move.

There was testimony which, perhaps, would have supported a finding that the movement of the derailed engine and tender was not due to negligence for which appellant was liable to appellee, but the question is: Was there testimony to support the finding made by the jury that the movement was due to negligence on its part? It is believed that there was such testimony. Appellant's roadmaster, Taylor, who, as stated above, was directing the work at the time appellee was injured, testified as follows on his direct examination as a witness for appellant:

"I was present when he (appellee) claims to have been hurt. I had direct charge of putting that engine back on the track. At the time he claims he was hurt the engine and tender were off on the ground on the oil mill track at Winnsboro. * * * We were trying to turn the derailed engine and tender back on the track. We were not able to turn it with our engine, and we got the Marshall & East Texas Railway people to bring their engine and hitch a box car between our engine and their engine to pull it on, as our engine was headed the wrong way, towards Greenville. In doing this work it became necessary to take some of the brake rigging down to get the frog under. That brake rigging was about the front truck of the tender. * * * Mr. Smith took it on himself to go under there. * * * I saw Smith come out from under the engine when he claims to have been hurt, and I asked him if he was hurt and

if he wanted to make a report, and he said, 'Hell, no.' He said his arm was numb. While he was under there I did not observe any movement of the tender, and I don't believe the tender moved when we coupled into it. It might have settled back a little. Two negroes were under there, and they didn't notice it moving. It may have settled back in the ground there where the dirt gave way. The wheels were buried up in the dirt. But it could not have settled back over two inches, and that would have been slow. Yes, I was looking right at it at the time, and I know it couldn't have settled more than two inches."

On his cross-examination Taylor testified: "Yes; the live engine we had there of our own was already hitched onto the derailed engine, and we had tried to pull the derailed engine on with that engine before we got the Marshall & East Texas engine. The two engines we had there, the derailed engine and the other one, were headed the same way and nothing between them. The Marshall & East Texas engine was headed the other way, towards Shreveport. At the time Smith claims he was hurt we were working to get a frog down, and we had arranged to get the Marshall & East Texas engine, but hadn't coupled it onto the engine to make a pull when he was hurt. Right at that time think they had gone off to get a box car. It was necessary to put a frog under the tender there. Yes; in order to place the frog it was necessary for some one to go under there and disconnect this brake rigging, and Smith was the one that did it. Yes; it was part of his duty; some of them had to do it. I knew it was being done, and I knew the men were under there doing the work. While they were under there doing that work this Marshall & East Texas engine with this box car came up and run up to our engine. At the time this Marshall & East Texas engine bumped this box car into our live engine I was standing right by the side of the derailed engine tank. They made a very slight jar, if any, when they coupled into it. Smith came out soon after they coupled into our engine, and I asked him if he was hurt and he said, 'Hell, no.' He was rubbing his arm, and said it numbed his arm. I also asked him if he wanted to make a report. I did not say to the trainmen there at that time, 'Hell, look out there; you are about to kill a man; be careful.' Pretty sure I did not say that. Said nothing about them looking out or be careful or you came near killing a man, that I remember of. No; I couldn't say just exactly how far the engine did move back there, but it couldn't have moved back over a couple of inches."

Being further examined by appellant the witness said:

"There was not much jar there when they made the coupling. I didn't say anything about the jar when they made the coupling. Of course, there is always a motion or slight jar. * * * I couldn't tell you whether or not Smith was under the tender right at the time they made the coupling, as I never thought much about it after we got through."

Further cross-examined by appellee, he testified:

"Yes; they have to come back with a certain amount of force to make a coupling on these automatic couplers, but I don't know how hard. I think they ought not to couple an engine into a car with a man under it working with a brake rigging, and in a position where he is liable to be crushed with a car. Sometimes we all do things we ought not to do. No; I wouldn't go under there if I thought they were going to couple an engine on."

From the testimony just set out alone we think the jury might have found that the movement of the tender was due to the act of employés in charge of the Marshall & East Texas engine in causing same to collide with the engine coupled to the derailed engine and tender, and that they might have found further that it was negligence for which appellant was liable to cause or permit the engines to collide under the circumstances. It is unnecessary, therefore, to look to the record to determine whether the verdict can be supported on other testimony appearing therein or not.

[4] If the jury might have found appellant to have been guilty of negligence as charged, then the further contention made by appellant that it appeared as a matter of law that appellee was injured as the result of risk he assumed, should be overruled; for he did not assume risk arising from appellant's negligence of which he was ignorant.

[5] The eighth assignment, under which appellant questions the sufficiency of the testimony to support a finding that the injuries from which appellee suffered were due to the negligence charged against it, and the tenth assignment, under which it complains of the action of the court in overruling its motion for a new trial on the ground of newly discovered evidence, are overruled. We think the testimony was sufficient to support findings that the injury inflicted upon appellee while he was under the tender rendered him sexually impotent, caused paralysis of his left side, will probably shorten his life, and also will probably permanently disable him from engaging in work of any character. It is not believed we should say the trial court abused the discretion he had when he overruled the motion for a new trial on the ground stated.

[6] But we are of opinion the verdict and judgment are grossly excessive, and that on that ground the judgment should be reversed, and the cause remanded for a new trial, unless a remittitur of the excess is filed here as permitted by law. Vernon's Sayles' Statutes, art. 1631. The judgment, we think, is for $30,000 more than it should be for. If a remittitur of that much of the judgment is filed with the clerk of this court within 20 days from the date of the filing of this opinion, the judgment will be so reformed as to adjudge a recovery in appellee's favor of the sum of $20,000, and, as so reformed, it will be affirmed; otherwise it will be reversed, and the cause will be remanded for a new trial.