FISHLEIGH *v.* DETROIT UNITED RAILWAY.

1. TRIAL — CARRIERS — STREET RAILWAYS — PERSONAL INJURIES — MISCONDUCT OF COUNSEL — APPEAL AND ERROR.

In an action against a street railway company for personal injuries, where, during a colloquy between counsel, plaintiff's counsel charged that defendant's counsel had stolen a chart from a hospital, but immediately withdrew the statement, saying "maybe you did not. Somebody took it out of a hospital," and no suggestion at the time was

205—Mich.—10.

made to the court that the jury be instructed to disregard the statement, which should not have been made, a reversal of the judgment for plaintiff is not justified· on this ground.

2. SAME—APPEAL AND ERROR—ARGUMENT OF COUNSEL.

While the Supreme Court will reverse cases for the intemperate argument of counsel where unjustified and un-.warranted attacks have been made upon witnesses called to testify in the case, it is not disposed to reverse them unless it clearly appears that such argument was unwarranted by the evidence and probably contributed to the result.

3. SAME—ARGUMENT OF COUNSEL—VERACITY OF WITNESSES—APPEAL AND ERROR.

An intimation by counsel for plaintiff, in his argument to the jury, that they would be justified in concluding that a witness for defendant had been guilty of perjury, was not so clearly unwarranted and without justification as to require a reversal of the case, where the testimony of such witness was flatly contradicted by witness for plaintiff, and was in regard to physical facts where there was no reason to say there might be an honest mistake, and it is patent that one of the witnesses was not testifying truthfully.

4. EVIDENCE—WITNESSES—PHYSICIANS AND SURGEONS — PRIVILEGE —WAIVER—STATUTES.

A question asked of a physician as to whether he had ever treated a brother or sister of plaintiff for diabetes was properly rejected, where there was no claim that the patient, who was not a party to the suit, had waived the privilege created by 3 Comp. Laws 1915, § 12550.

5. SAME—APPEAL AND ERROR.

Said testimony being prohibited by said section, this court will not consider the reason assigned by the court below for rejecting it, viz., that it could not be received on the question of heredity, not being the father or mother.

6. TRIAL—EVIDENCE—MORTALITY TABLES—INSTRUCTIONS.

The charge of·the court as to the use of the mortality tables, when considered as a whole, *held*, not open to the construction that the expectancy found therein was controlling or expressed the opinion of the trial judge that it should be accepted.

7. SAME—INSTRUCTIONS—"MATERIAL" TESTIMONY—CREDIBILITY OF
WITNESSES.
> Where the court charged the jury that if they believed "any
witness for either side has deliberately falsified, or has
lied about any part of his testimony, from that fact you
may disregard all of his testimony or only a portion of
it; I say you may disregard all of it, or you may believe
some of it, if it is corroborated by other testimony, or
whether it is or not," an objection that this instruction
did not refer to "material" testimony, *held*, that, taking
the charge as an entirety, defendant was not harmed by
the instruction on this subject.

8. NEW TRIAL—EVIDENCE—WEIGHT OF EVIDENCE.
> Where there was abundant evidence to support the finding
of the jury that plaintiff's condition was the result of the
street car accident, the motion for new trial on the
ground that the verdict was against the weight of the
evidence was properly denied.

9. DAMAGES—EXCESSIVE VERDICT—PERSONAL INJURIES—DUTY OF
APPELLATE COURT.
> While, in personal injury cases, the amount of damages
is primarily a question for the jury, yet where it clearly
and manifestly appears that the verdict is the result of
prejudice, caprice, passion, partiality, sympathy, or kin-
dred reasons, rather than a result of the consideration
of the evidence and actual conditions, the appellate court,
in the discharge of its functions, is bound to act, and
either vacate the judgment or require an abatement from
the amount recovered as a condition of affirmance.

10. SAME.
> A verdict for $23,000 was not excessive, where the evidence
showed that before the accident plaintiff was a healthy,
robust woman, weighing about 150 pounds, a wage earner,
and that in 22 months since the accident and as a result
of it she had become a helpless cripple, weighing 98½
pounds, that she was confined to her bed for 14 months,
and suffered and will continue to suffer great pain, and
that her expenses necessitated by the accident exceeded
$2,200.

Error to Wayne; Webster, J. Submitted January
22, 1919. (Docket No. 88.) Decided April 3, 1919.

Case by Maude Fishleigh against the Detroit United Railway for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Corliss, Leete & Moody* and *A. B. Hall,* for appellant.

*Monaghan, Monaghan, O'Brien & Crowley,* for appellee.

FELLOWS, J. Plaintiff brings this action to recover damages for personal injuries received by her in an accident occasioned by the collision of two street cars owned and operated by and on defendant's system in the city of Detroit, on the evening of February 14, 1916. When the cars collided plaintiff was thrown forward, her knee or knees striking the seat in front; upon the recoil she struck the back of the seat, which broke, either as the result of her body striking against it or from others falling upon it, the car being crowded, and she was struck by the broken seat or a piece thereof, an iron rod along with the wood, across the lower part of the back. She was unable to extricate herself from the position in which she was wedged with her knees against the front seat and the broken piece of the seat pressed against the lower part of her back for several minutes, but was finally taken out by a policeman and placed in an ambulance and taken home. It is not seriously controverted but that she was confined to her bed for 14 months; nor that since she has been able to leave her bed that she is only able to go a few steps at a time with the aid of crutches, or a crutch and cane; nor that her present condition is a permanent one. Defendant contended in the court below and here contends that plaintiff's condition was and is due, at least in part, to conditions antedating the accident, and to which we shall presently refer.

The plaintiff at the time of the accident was nearly

29 years old and was employed as a saleslady by the Crowley-Milner Company, and was earning from eleven to twelve dollars per week. By her testimony she showed that in February, 1912, she was operated on for appendicitis, from which operation she says she speedily recovered. On September 30, 1913, she was accidentally shot, the bullet lodging in the twelfth dorsal where it still remains. She claims to have recovered from this accident and to have resumed her work the following spring. Her testimony, that of members of her family, her associates at the store, and her acquaintances tend to show that after she resumed her work she was in good health, suffered no inconvenience from the bullet, was of a cheerful disposition, a good saleswoman, very active in her work at the store, enjoyed society, was a musician, danced frequently at parties, weighed 150 pounds and in fact was until the accident in question in the enjoyment of perfect health. Photographs taken the summer before the street car accident show her to be apparently a robust, healthy woman.

The testimony adduced on behalf of plaintiff tended to show that during the 14 months after the accident that plaintiff was confined to her bed she was a great sufferer from pain, required the constant attendance of nurses, frequent visits of her doctor, sometimes as high as four or five a day, and generally at least two a day; her sufferings at times being so intense as to result in unconsciousness; that administration of morphine to relieve the pain was impossible, due to its nauseating effect upon her, and on a few occasions chloroform was administered; that she would have spasms of pain, her limbs would cramp and be drawn up; that she had frequent chills and very hot applications had to be almost constantly applied; that it was difficult to move her, due to the extreme sensitiveness of the afflicted parts, and that her intense suffering

was practically continuous. The testimony also tended to show that she continued to suffer great pain after she was able to leave her bed; that she is unable to move any considerable distance, even with the aid of crutches, and that her present condition is that of a helpless, hopeless cripple. It is undisputed that in the summer of 1916 plaintiff was operated upon, and a portion of the coccyx (the lower tip of the spine) was removed, and that in January, 1917, she submitted to another operation and her right ovary was removed. At the time of the trial she weighed 98½ pounds. The plaintiff's medical testimony was to the effect that her condition was the result of the street car accident.

The defendant does not controvert the question of its negligence. It insists, however, that the plaintiff's present condition is not due to the street car accident; that the operation for appendicitis has something to do with undermining plaintiff's health, and that the gunshot wound together with the presence of the bullet in the spine is the cause of the trouble. Testimony was adduced tending to show that the summer following her return to the store she was not in good health, that the gunshot wound continued to affect her, and that she often consulted a physician and continued to receive medical treatment for some time after she resumed her work, and that her condition after the gunshot wound was not that of a healthy woman. The medical witnesses called by the defendant conclude that the present condition of plaintiff is traceable directly to the gunshot wound and the bullet in the spine. It should be here stated that the declaration does not count upon an aggravation of a pre-existing condition. Nor does the plaintiff claim by her declaration that as the result of the street car accident diabetes developed. Defendant by its testimony insisted that plaintiff is now suffering from

diabetes insipidus; and claimed that plaintiff could not under the declaration recover for an aggravation of a pre-existing condition, or if her present ailment is diabetes insipidus she could not recover therefor because not alleged. Plaintiff did not controvert defendant's legal claims as to what could be recovered for under the declaration, and the case went to the jury upon the conflicting claims of the parties as to the cause of plaintiff's present condition. The jury returned a verdict of $23,000.

In this court it is insisted that errors committed on the trial entitle defendant to a reversal. It is further insisted that errors were committed upon the trial, which, while not of themselves constituting reversible error, so prejudiced defendant's case as to result in a grossly excessive verdict. And, finally, it is insisted that the trial court erred in not setting aside the verdict on defendant's motion based on the grounds that it was excessive in amount and against the weight of the evidence.

Dr. J. B. Kennedy performed the operation on plaintiff for the removal of a portion of the coccyx at Grace Hospital, and was called as a witness by her. In giving his testimony he referred to the fact that charts were kept at the hospital. Upon his cross-examination he was inquired of with reference to the chart and one was produced by plaintiff's counsel, and the witness was quite fully cross-examined about it. Then the following occurred:

"Q. Now, doctor, these are what they call the physician's order or instruction sheet?

"A. Yes.

"Q. Now, accompanying that is kept in the hospital a daily record by the nurse, is there not?

"A. Yes.

"Q. Is that here?

"A. I have not seen it.

"Q. Have you that, Mr. Monaghan?

"*Mr. Monaghan:* No. Maybe it is the one you have no right to over there, that I would like to see, that you probably took from one of the hospitals some place.

"*Mr. Hall:* Which one?

"*Mr. Monaghan:* Right there, Mr. Hall, these (indicating).

"*Mr. Hall:* You would like to look at these?

"*Mr. Monaghan:* Yes, I would like to look at that. You closed it up the other day when I tried to.

"*Mr. Hall:* You ought not to peek. Your honor, he has no right to pick my papers up off the table. Now, you are just trying to see what it is, aren't you?

"*Mr. Monaghan:* Yes, I would like to know, because evidently it is a chart that you stole from some place. I will take that back.

"*Mr. Hall:* I want an exception to that remark that I stole a chart from some place.

"*Mr. Monaghan:* Well, maybe you did not. Somebody took it out of a hospital.

"*Mr. Hall:* I want an exception to that statement, if the court please.

"*Mr. Monaghan:* I want to see these, I say, if it concerns the plaintiff in this case, I would like to see it now.

"*Mr. Hall:* You can see it when I get good and ready.

"*Mr. Monaghan:* I would like to know on the record where counsel got it.

"*Mr. Hall:* I got it on a subpœna, if you want to know.

"*Mr. Monaghan:* Subpœna?

"*Mr. Hall:* Yes, sir.

"*Mr. Monaghan:* How can you get a chart on a subpœna?

"*Mr. Hall:* Well, I have, haven't I?

"*Mr. Monaghan:* I would like to see it now.

"*Mr. Hall:* I have asked, your honor, as long as this controversy has been gone into, I have subpœnaed the Providence Hospital with the chart and the record. Now, if they will show me the Providence Hospital chart, they may have this one.

"*Mr. Monaghan:* May it please the court, I have never seen a Providence Hospital chart yet. I would

like to see it if counsel has that, too, I would like to see that.

"*Mr. Hall:* No, your honor, the answer of the Mother Superior this morning was that it was in the hands of Dr. Parker, and then I telephoned her back and she said she would try and get it, and we have been telephoning all day trying to get that chart.

"*Mr. Monaghan:* You might bring in Dr. Parker. The only papers I got from Dr. Parker are what you have in your hands.

"*Mr. Hall:* I do not claim you have them.

"*Mr. Monaghan:* That is very kind of you.

"*Mr. Hall:* I would like, if the court please, undoubtedly these papers were all kept together and I would like Mr. Monaghan if he has the record—you know what I mean—the distinction between—

"*A.* I know what you mean."

Later charts were produced and such parts as were regarded important were made a part of the record.

The objection urged by defendant's counsel is to the statement that he had stolen this chart, and the further statement by plaintiff's counsel, "maybe you did not. Somebody took it out of a hospital." It will be noted that defendant's counsel made no suggestion to the court during the colloquy that the jury be instructed to disregard the statement of plaintiff's counsel (see *Eberts* v. *Mt. Clemens Sugar Co.,* 182 Mich. 449). Even before the court or defendant's counsel had an opportunity to say anything plaintiff's counsel had retracted his first statement. Counsel should not have made this statement. He appreciated this and promptly withdrew it. Upon such circumstances the improper remark does not justify a reversal on this ground. *Pruner* v. *Railway,* 173 Mich. 146. But we think it should be stated further that a careful reading of this record demonstrates that all of the attorneys engaged in this trial, which lasted seven days, were courteous in their conduct towards each other with this single exception. There were passages be-

tween them, some serious, some good-natured, not necessary or proper to here detail, but nothing that questioned the good faith or integrity of any one of the attorneys engaged in the trial. From what occurred upon the trial as detailed upon this record it would be a far-fetched conclusion that the jury, or any member of it, would conclude from this transaction that defendant's counsel had been guilty of any unprofessional conduct, or that plaintiff's counsel deliberately and seriously charged him with it. As to the statement that some one had taken the chart out of the hospital the record shows it was taken from the hospital and that it was done in a proper manner. The trial judge in his charge expressly stated to the jury,

"You are to disregard any remarks made by counsel one to the other in the course of hearing the testimony in this case."

This transaction did not constitute reversible error, nor are we impressed that it prejudiced defendant's case.

During the course of his argument of the case to the jury counsel for the plaintiff used the following language:

"And that from Dr. Povey had to be wrung out of his teeth as he sat there, in my judgment, gentlemen of the jury, perspiring with the perspiration of perjury. * * * I say to you, gentlemen of the jury, that if Dr. Povey lied to you in this case, and lied deliberately, he is guilty of perjury before the living God, and I say to you his manner upon the witness stand, the manner of his giving testimony in this case, justifies you in your conclusion upon that subject."

We have had occasion to reverse cases for the intemperate arguments of counsel and where unjustified and unwarranted attacks have been made upon witnesses called to testify in the case. Such cases have been numerous; among them see *Mott* v. *Railway Co.*, 120 Mich. 127; *Dolph* v. *Railway Co.*, 149

Mich. 278; *Holmes* v. *Loud*, 149 Mich. 410; *Geist* v. *Railway*, 91 Mich. 446. But this court is not disposed to reverse cases upon the argument of counsel unless it clearly appears that such argument was unwarranted by the evidence and probably contributed to the result. *Houser* v. *Carmody*, 173 Mich. 121; *Lathrop* v. *Sinclair*, 110 Mich. 329; *People* v. *Tubbs*, 147 Mich. 1; *People* v. *Peck*, 147 Mich. 84; *Battishill* v. *Humphreys*, 64 Mich. 514. In the last cited case it was said by Mr. Justice CHAMPLIN:

"Upon the whole matter of the exceptions to the remarks of counsel, while we do not approve, yet we cannot say that they were likely to or did mislead or prejudice the jury against defendants. Extravagant expressions are apt to be used in the heat of argument. Invective is sometimes resorted to, persuasions made, and forensic skill employed,—all with the design to influence the jury in behalf of a client. But all these arts and appliances are permissible so long as confined within legitimate bounds of the discussion of the facts before the jury; and if courts are to take it upon themselves to set aside verdicts because some irrelevant remarks are made use of by counsel in their arguments, they will find constant employment, and few indeed will be the verdicts which will be sustained."

It becomes necessary for us in considering this question under the rule heretofore announced to consider the testimony in the case for the purpose of ascertaining whether the argument was clearly unwarranted. If warranted by the record counsel had the right to make it. If a witness for the plaintiff testifies to a state of facts, and a witness for the defendant testifies to an exactly opposite state of facts, and it is upon a subject that there is no reason to say there may be an honest mistake, it is patent that one of the witnesses is not testifying truthfully; and under these circumstances each counsel has the right to

argue to the jury that his witness is the truthful one and the other the untruthful one. If in the instant case the record discloses such conflict between the testimony of this witness and that of other witnesses as that the jury in reaching their conclusion would be reasonably required to accept the version of one side, and reject that of the other, it was certainly proper for counsel to insist that his witnesses were truthful and the other untruthful. And we cannot determine for him the form of expression he may use. It is attacks upon witnesses that were unwarranted by the record that this court has condemned. We are not to determine when considering this question which of the witnesses speaks the truth; we do not see them, know nothing of their appearance or their manner of giving testimony; our province is only to determine whether the attack is unwarranted, whether there is anything in the record from which it may be said that counsel had no basis for the argument, and that it was without justification.

We have already made clear that the medical testimony was in direct conflict. Doctors may and do honestly differ in their diagnosis of a case, and we shall not devote any space at this time to the conflict in the opinion testimony. But there were conflicts in the testimony of physical facts, to some of which but not all we shall now refer. Shortly before the trial plaintiff submitted to an examination in the presence of her physicians and those of defendant. One of the objective symptoms of plaintiff's trouble as claimed by her physicians was the exaggerated reflexes or jerks of the knee caused by striking it. This seems to have been regarded as important by the physicians. Drs. Ives and Kennedy testified to these exaggerated reflexes on this examination. Dr. Povey, defendant's physician, not only denied this but testified that in order to get the reflex the patient was asked to re-

inforce by putting her hands together and pulling as hard as she could with her eyes closed. This was flatly denied by both Dr. Ives and Dr. Kennedy, Dr. Kennedy specifically stating that the reinforcement method was not used to get the reflexes, but was used later and then only in testing for ankylosis, while Dr. Ives testified that it was agreed by the physicians for plaintiff and defendant present at the examination that the reflexes were greatly increased. Dr. Povey testified that he made an examination of plaintiff in April. He testified that he made an appointment with plaintiff's physician, Dr. Parker, for this examination. In this he is disputed by Dr. Parker, who was not present when he made the examination. He testified that upon this examination he conducted a vaginal examination, and that the uterus was in normal position. Dr. Parker testified that it was out of position—tipped backwards. Dr. Povey, as a result of the examination, depreciates plaintiff's ovarian trouble. Dr. Parker regarded it as serious, and it is undisputed that one ovary was removed. Plaintiff claims that when Dr. Povey asked her questions about her condition her principle complaint was about her legs, the lower part of her back, the end of her spine, and down the right leg. Dr. Povey says that her complaint about her back was not emphasized to any extent, and the general tendency of his testimony was that her back, where the seat struck her in the accident, was given no prominence in her complaints. We think there was such a conflict between the testimony of this witness and that of others called in the case that we cannot say that the language of counsel was clearly unwarranted and without justification.

We do not overlook in the consideration of the assignments of error relative to the conduct of counsel the point made by the plaintiff, that an exception alone without any ruling or instruction given or asked for

by the court is not available here. We have considered fully these assignments of error in view of the second claim made by defendant.

Dr. W. J. Cassidy, a witness called by defendant, was asked this question:

"Now, without mentioning any names, doctor, did you ever perform—or did you ever treat any immediate member of Miss Fishleigh's family for diabetes?"

During the discussion it was stated by defendant's counsel that the question referred to a brother or sister. The court sustained the objection upon the ground that it could not be received on the question of heredity, not being the father or mother. We need not consider the reason assigned by the court for his ruling as we are satisfied that the doctor was prohibited by section 12550, 3 Comp. Laws 1915, from testifying to what he learned in his professional capacity, while treating, and for the purpose of treating, the brother or sister. *Briggs* v. *Briggs*, 20 Mich. 34; *Briesenmeister* v. *Knights of Pythias*, 81 Mich. 525. The privilege was the privilege of the patient who was not a party to this suit. There is no claim that the privilege had been waived by the patient.

We are not impressed that the charge of the court as to the use of the mortality tables when considered as a whole, as we must consider it, is open to the construction that the expectancy found therein was controlling or expressed the opinion of the trial judge that it should be accepted. In his charge to the jury on this subject, among other things, he said:

"This table is designed to show the expectancy of life which may be entertained by average persons of given ages. The information you can derive from it is the time that the average person of equal age with the one under consideration in the present case may be expected to live. In the nature of things there can be no certainty whether any particular individual will

live for a longer or shorter period than the probable expectancy of the average person of the same age as laid down in this table. In estimating the probable length of plaintiff's life, as compared with the average duration of life of one of the same age, her health and all other matters pertinent as disclosed by the evidence, ought to be considered and the proper weight given to all these things in fixing the expectancy of life, diminishing or increasing the figures laid down in the table according to the facts of the particular case before you."

Error is also assigned upon the following excerpt from the charge:

"And if you believe further, in applying those tests and others, that a witness, any witness, for either side, has deliberately falsified, or has lied about any part of his testimony, from that fact you may disregard all of his testimony or only a portion of it; I say you may disregard all of it, or you may believe some of it, if it is corroborated by other testimony, or whether it is or not."

The specific objection urged being that this instruction did not refer to "material" testimony. The charge did not refer to any specific witness and defendant's counsel did not call the attention of the court to the omission. We might dispose of this objection on the authority of *Granger* v. *Darling*, 156 Mich. 31, on the ground that the objection is not here available. But we have frequently held that isolated excerpts from the charge may not be considered alone; that we must consider the charge in its entirety. This excerpt was but a part of the instruction on the credit of witnesses. The court has stated the things to be considered in weighing the testimony of witnesses, their appearance on the stand, interest or lack of it, their manner, everything, so that the jury could decide which was truthful, etc., and concluded after the above excerpt with the statement:

"In other words, you, again, are the sole judge about that. The effect of a witness lying before you is for you to decide, that is, upon the balance of his testimony."

We are not persuaded that defendant was harmed by the instructions on this subject taken as a whole.

We have considered, but not discussed, all the errors assigned growing out of the trial. We are unable to find in any of them reversible error.

Defendant moved for a new trial, urging that the verdict was against the weight of the evidence and that it was excessive. From what has been heretofore stated it will be noted that the questions for the jury were within a very limited compass. The negligence of the defendant was admitted; there was no question of contributory negligence involved; and the seriousness of plaintiff's present condition was established by the overwhelming weight of the evidence and apparently not doubted by defendant. This left then for the jury to determine whether her condition and injuries were as alleged in the declaration and whether they were caused by defendant or by some other cause. If defendant alone was responsible for her injuries and condition what amount would reasonably compensate her? These were the issues to be determined by the jury.

We think there is an abundance of testimony to support the finding of the jury that the street car accident produced plaintiff's injuries and present condition. Many witnesses testified to her condition of perfect health after the gunshot wound. The X-ray of the spine shows the bullet to be encased, and medical testimony, the reliability of which was for the jury, is to the effect that when so encased the probabilities of any trouble from it are at a minimum. There was also an abundance of testimony that plain-

tiff was not afflicted with diabetes insipidus. The evidence supports the finding of liability.

Should this court set aside this verdict because excessive? In considering this question the power of the appellate court to act and to vacate judgments or to require an abatement from the amount recovered as a condition of affirmance must not be doubted. That such power rests in this court is beyond question. This power is absolutely essential to the proper administration of justice. Nor in the consideration of the question should the functions of the jury and of the reviewing court be confused. In personal injury cases the amount of damages is not subject to exact mathematical calculation. Primarily the question is for the jury and we cannot arbitrarily substitute our judgment for that of the triers of the facts. That would be to usurp the functions of the jury. But where it clearly and manifestly appears that the verdict is the result of prejudice, caprice, passion, partiality, sympathy, or kindred reasons rather than a result of the consideration of the evidence and actual existing conditions, the appellate court in the discharge of its functions is bound to act. In reviewing a case with this question involved it becomes our duty to carefully examine the record, to learn whether there have been appeals to prejudice, passion, partiality and those things not having a legitimate place in a trial where rights are being adjudicated, to determine whether the amount awarded is manifestly and clearly without foundation in the testimony, and to examine analogous cases in this and other appellate courts. While no two accidents are liable to be exactly alike and therefore no two cases exactly alike, they may be similar and other cases helpful in reaching a conclusion.

We have read this record of 630 pages in its en-

tirety and we find within it no suggestion by plaintiff's counsel during the trial or argument of the poverty of plaintiff or wealth of defendant, no parading of the fact that defendant is a corporation; in fact, there is an absence of those things which would tend to unduly influence a jury or prejudice defendant. The record, however, does establish great suffering, intense pain, a present and permanent disability of plaintiff, and if the testimony offered by plaintiff is true, and the jury has found it to be true, she will continue a helpless cripple for life. By the verdict the jury has found defendant alone responsible for this. The verdict was a large one, the injuries serious, the case one for substantial damages. The trial occurred about 22 months after the accident. During that time plaintiff's expenses necessitated by the accident exceeded $2,200. It may be assumed that the expenses of operation, nurses and medical attendance will be less and her necessary expenses reduced in the future. The trial court, who saw the plaintiff and heard the testimony, in overruling defendant's motion said:

"This is an exceptional case. Rarely is a plaintiff in a personal injury case in as bad a condition as the plaintiff was at the time of this trial. It was very evident that her condition was very serious and that she had suffered a great deal. If her sufferings and her condition was due to the street car accident, and the jury so found, the verdict was far from being excessive. It was very evident that this was a case that would result in a large verdict, and the evidence would clearly sustain a larger verdict than the one rendered."

Let us now turn to some of the cases. While many have been examined by us but comparatively few will be discussed or cited. Exhaustive notes with numerous citations of authorities will be found in L. R. A. 1915F, 30, and 16 Ann. Cas. 8. In *Retan* v. *Railway*

*Co.*, 94 Mich. 146, this court affirmed a judgment of $30,000 against the objection that it was excessive. Both feet had to be amputated, one near the knee and the other forward of the heel. In *Guy* v. *Railroad Co.*, 198 Mich. 140, we affirmed a judgment of $35,000 for loss of the left arm just below the shoulder and the right hand at the wrist and other injuries. In *Huggard* v. *Refining Co.*, 132 Iowa, 724 (109 N. W. 475), a judgment for $32,916 was affirmed. Without detailing plaintiff's injuries it will suffice to state that he was rendered a helpless invalid requiring constant attendance for the balance of his life. He was 27 years old when injured and was then earning $1,100 per year. In *Perkins* v. *Telegraph Co.*, 155 Cal. 712 (103 Pac. 190), the supreme court of California affirmed a judgment for $25,000. Plaintiff there, as a result of the accident, was paralyzed on the right side, blind in one eye and the other impaired, had a curved spine, had hemorrhage of lungs and stomach. She was 57 years old. The supreme court of Missouri in *Corby* v. *Telephone Co.*, 231 Mo. 417 (132 S. W. 712), affirmed a judgment for $22,500. Plaintiff there was 27 years old, earning $3 per day. He was paralyzed from his hips down and had suffered great pain. In *John* v. *Railway Co.*, 42 Mont. 18 (111 Pac. 632, 32 L. R. A. [N. S.] 85), a judgment of $25,000 was affirmed. Plaintiff there intermittently suffered pain in his head, slept poorly, his right side was partly paralyzed and he had lost the use of his voice. He was pronounced by one witness, "a physical wreck." His injuries were permanent and would probably result in death. In *St. Louis, etc., R. Co.* v. *Webster*, 99 Ark. 265 (137 S. W. 1103, 1199), a verdict for $35,000, which the court remarked "seems to reach the limit," was affirmed. Plaintiff, 35 years old, was earning $79 per month. The injury was to the spine. He had suffered greatly; his sexual powers were lost. He

would not be able to perform any manual labor in the future and would continue to grow · worse. In *Lanyon* v. *Lanquist & Illsley Co.*, 157 Ill. App. 316, plaintiff had suffered concussion of the brain necessitating operations, had a slow pulse and paralysis in the left side, impairment of brain, a tricky memory and other injuries. A judgment for $35,000 was affirmed. In *Texas, etc., R. Co.* v. *Barwick*, 50 Tex. Civ. App. 544 (110 S. W. 953), a judgment for $25,000 was affirmed. The plaintiff's back was broken, and his injuries were most serious. His earning capacity was destroyed. What his earnings were or his age was do not appear. A judgment for $22,000 was affirmed in *Louisville, etc., R. Co.* v. *Melton*, 127 Ky. 276 (105 S. W. 366, 110 S. W. 233, 112 S. W. 618). Plaintiff, a young carpenter, was earning $3 per day. When injured he weighed 145 pounds, at the time of the trial but 116 pounds; one leg was fractured at the knee, the other at the hip, his ribs on one side and his back were broken, and he was paralyzed from his waist down. In *Miller* v. *Rhode Island Co.* (R. I.), 82 Atl. 787, the jury rendered a verdict for $20,800 which was reduced by the trial court to $16,000. Upon review in the supreme court the action of the trial court was reversed and the judgment restored to the amount found by the jury. Plaintiff suffered a permanently strained back, with nervous disorders, and would require treatment in a sanitarium for one or two years. In *Tuthill* v. *Railroad Co.*, 30 N. Y. Supp. 959, the court declined to disturb a judgment for $18,500 where the medical testimony was to the effect that plaintiff's condition was incurable and will grow worse until he becomes helpless. In *Houston, etc., R. Co.* v. *Gray* (Tex. Civ. App.), 137 S. W. 729, plaintiff was helpless and a great sufferer from pain; his physicians pronounced his condition due to paralysis of the spine; defendant's medical testimony concluded that

the paralysis was caused by traumatic hysteria. A judgment for $30,000 was affirmed.

For cases in which large judgments have been affirmed as against the objection that they were excessive, see *Smith* v. *Whittier*, 95 Cal. 279 (30 Pac. 529); *St. Louis, etc., R. Co.* v. *Coy*, 113 Ark. 265 (168 S. W. 1106); *Missouri, etc., R. Co.* v. *Farris* (Tex. Civ. App.), 120 S. W. 535; *Johnson* v. *Railroad*, 35 Utah, 285 (100 Pac. 390); *Farrell* v. *Illinois Tunnel Co.*, 177 Ill. App. 425.

Let us now turn to those cases where the appellate court has reversed or reduced judgments because excessive. As in the last class of cases we shall discuss but a meager portion of those found in the books. In *St. Louis, etc., R. Co.* v. *Brown*, 100 Ark. 107 (140 S. W. 279), the verdict was for $50,000, said to be the largest one for personal injuries ever rendered in that State. There was considerable prejudicial conduct in the trial of the case. The injuries were serious and resulted in the death of plaintiff before the final disposition of the case. The judgment was reduced to $25,000. In *Gordon* v. *Railway Co.*, 222 Mo. 516 (121 S. W. 80), plaintiff was 29 years old, able-bodied and earning $90 per month. His back and five ribs were broken, pelvis and hip bones mashed. He was paralyzed from the middle of his back down, could not sit up, except when propped by pillows. He died after the trial in the court below. A judgment for $50,000 was reduced by the trial court to $35,000 and further reduced to $25,000 on rehearing in the supreme court. In *Missouri, etc., R. Co.* v. *Smith* (Tex. Civ. App.), 172 S. W. 750, plaintiff claimed injuries of a serious nature to his spine, back, legs and side and a total loss of sexual power. A judgment for $50,000 was reduced to $20,000. In *Waterman* v. *Railroad Co.*, 82 Wis. 613 (52 N. W. 247, 1136), a judgment for $25,000 was reduced to $20,000. There was prejudicial argument

of counsel on the question of damages, and the delays of the defendant had been great. The accident had rendered plaintiff practically helpless. On a former trial the verdict had been for $22,500. In considering all angles of the case it was thought proper to reduce the verdict instead of reversing the case. In *Fawdrey v. Railroad Co.*, 64 App. Div. 418 (72 N. Y. Supp. 283), a verdict for $28,500 had been set aside by the trial judge. The plaintiff, a pregnant woman, brought an action for injuries resulting in premature confinement, paralysis on the right side and inability to control the sphincter muscle. Affirming the order it was held that the amount recovered was excessive. In *Mosso v. E. H. Stanton Co.*, 85 Wash. 499 (148 Pac. 594), a laborer, 35 years of age, earning $2.50 per day, was not wholly incapacitated, but could do light work. A judgment for $12,500 was reduced to $7,500. In *Melse v. Alaska Commercial Co.*, 42 Wash. 356 (84 Pac. 1127), plaintiff, a longshoreman, earning on an average $60 per month, received injuries resulting in the amputation of one leg at the knee. A verdict for $20,000 was held to be excessive and reduced to $14,000. In *Sioux City, etc., R. Co. v. Finlayson*, 16 Neb. 578 (20 N. W. 860), the injury was described by the physicians as concussion of the spinal cord. While the injury undoubtedly unfitted plaintiff for continuance as a railroad engineer he was able to and did engage in other business. At times he was free from pain and at others had a soreness and pain in his back. A judgment for $9,250 was reduced to $6,250. In *Knock v. Railroad Co.*, 38 Nev. 143 (145 Pac. 939, L. R. A. 1915F, 3), plaintiff was a railroad man 29 years old, earning $170 per month. The injury resulted in the amputation of the arm below the elbow, incapacitating him from continuing in his former employment. A verdict for $25,500 was reduced to $15,000.

For cases where the appellate court has reduced or reversed judgments as excessive, see *City of Elgin* v. *Nofs,* 113 Ill. App. 618; *Moore* v. *Transit Co.,* 226 Mo. 689 (126 S. W. 1013); *McKenzie* v. *Colliery Co.,* 55 Wash. 495 (104 Pac. 801, 28 L. R. A. [N. S.] 1244); *Williams* v. *Railway Co.,* 42 Wash. 597 (84 Pac. 1129); *Louisville, etc., R. Co.* v. *Reaume,* 128 Ky. 90 (107 S. W. 290); *Denver, etc., R. Co.* v. *Scott,* 34 Colo. 99 (81 Pac. 763); *Missouri, etc., R. Co.* v. *Dalton,* 56 Tex. Civ. App. 82 (120 S. W. 240); *Padrick* v. *Railway Co.,* 128 Minn. 228 (150 N. W. 807, L. R. A. 1915F, 1); *Brennan* v. *Railway Co.,* 130 Minn. 314 (153 N. W. 611, L. R. A. 1915F, 11); *Union Pacific R. Co.* v. *Hause,* 1 Wyo. 27; *Searles* v. *Railway Co.,* 70 N. J. Law, 388 (57 Atl. 134).

In the instant case the record discloses a most serious condition, more serious than it is often our province to consider in personal injury cases. From a robust, cheerful, vigorous woman, a wage-earner, weighing about 150 pounds, plaintiff has in 22 months' time wasted to a helpless cripple weighing 98½ pounds. This changed condition has come upon her since this unfortunate accident; during 14 months of this time plaintiff has been confined to her bed. During this time pain has been ever present. Her earnings were not large but her sufferings have been great and will so continue. By the use of the mortality tables we could compute with reasonable accuracy her loss of past and prospective earnings. But there is no market place where pain is bought and sold. Compensation for suffering must primarily be fixed by the jury with an honest judgment based on the evidence as their guide. If grossly excessive, if the result of prejudice, or passion, or influence other than the evidence in the case, their determination cannot stand in the reviewing court. But that court must find something more tangible than a difference of

opinion as to amount before it should vacate a verdict which has the approval of the trial court.

Considering this record, the findings of the trial judge, the decisions of this and courts of last resort of our sister States, we are not persuaded that we should disturb this judgment.

It is affirmed.

BIRD, C. J., and OSTRANDER, MOORE, STEERE, BROOKE, STONE, and KUHN, JJ., concurred.